# SHEARSON/AMERICAN EXPRESS INC. ET AL. *v.* McMAHON ET AL.

No. 86–44.   Argued March 3, 1987—Decided June 8, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and SCALIA, JJ., joined, and in Parts I, II, and IV of which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined.   BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 242. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 268.

*Theodore A. Krebsbach* argued the cause and filed briefs for petitioners.

*Richard G. Taranto* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Cohen, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman,* and *David A. Sirignano.*

*Theodore G. Eppenstein* argued the cause for respondents. With him on the brief was *Madelaine Eppenstein.** 

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents two questions regarding the enforceability of predispute arbitration agreements between brokerage firms and their customers. The first is whether a claim brought under § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 48 Stat. 891, 15 U. S. C. § 78j(b), must be sent to arbitration in accordance with the terms of an arbitration agreement. The second is whether a claim brought under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1961 *et seq.,* must be arbitrated in accordance with the terms of such an agreement.

I

Between 1980 and 1982, respondents Eugene and Julia McMahon, individually and as trustees for various pension and profit-sharing plans, were customers of petitioner Shear-

---

*Briefs of *amici curiae* urging reversal were filed for the American Arbitration Association by *Michael F. Hoellering, Joseph T. McLaughlin, Rosemary S. Page, Thomas Thacher, Gerald Aksen, Sheldon L. Berens, Richard S. Lombard, Robert MacCrate, John R. Stevenson,* and *Robert B. von Mehren;* and for the Attorneys for Securities Industry Association, Inc., et al. by *Joseph G. Riemer III, Judith Welcom, Paul Windels III, William J. Fitzpatrick, Donald B. McNelley, Steven N. Machtinger, Paul J. Dubow,* and *Joseph McLaughlin.*

Briefs of *amici curiae* urging affirmance were filed for Willie D. Chandler et al. by *Stirling Lathrop* and *Richard D. Greenfield;* and for Bruce Cordray et al. by *Denis A. Downey.*

son/American Express Inc. (Shearson), a brokerage firm registered with the Securities and Exchange Commission (SEC or Commission). Two customer agreements signed by Julia McMahon provided for arbitration of any controversy relating to the accounts the McMahons maintained with Shearson. The arbitration provision provided in relevant part as follows:

> "Unless unenforceable due to federal or state law, any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect." 618 F. Supp. 384, 385 (1985).

In October 1984, the McMahons filed an amended complaint against Shearson and petitioner Mary Ann McNulty, the registered representative who handled their accounts, in the United States District Court for the Southern District of New York. The complaint alleged that McNulty, with Shearson's knowledge, had violated § 10(b) of the Exchange Act and Rule 10b–5, 17 CFR § 240.10b–5 (1986), by engaging in fraudulent, excessive trading on respondents' accounts and by making false statements and omitting material facts from the advice given to respondents. The complaint also alleged a RICO claim, 18 U. S. C. § 1962(c), and state law claims for fraud and breach of fiduciary duties.

Relying on the customer agreements, petitioners moved to compel arbitration of the McMahons' claims pursuant to § 3 of the Federal Arbitration Act, 9 U. S. C. § 3. The District Court granted the motion in part. 618 F. Supp. 384 (1985). The court first rejected the McMahons' contention that the arbitration agreements were unenforceable as contracts of

adhesion. It then found that the McMahons' § 10(b) claims were arbitrable under the terms of the agreement, concluding that such a result followed from this Court's decision in *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213 (1985), and the "strong national policy favoring the enforcement of arbitration agreements." 618 F. Supp., at 388. The District Court also held that the McMahons' state law claims were arbitrable under *Dean Witter Reynolds Inc.* v. *Byrd, supra.* It concluded, however, that the McMahons' RICO claim was not arbitrable "because of the important federal policies inherent in the enforcement of RICO by the federal courts." 618 F. Supp., at 387.

The Court of Appeals affirmed the District Court on the state law and RICO claims, but it reversed on the Exchange Act claims. 788 F. 2d 94 (1986). With respect to the RICO claim, the Court of Appeals concluded that "public policy" considerations made it "inappropriat[e]" to apply the provisions of the Arbitration Act to RICO suits. *Id.*, at 98. The court reasoned that RICO claims are "not merely a private matter." *Ibid.* Because a RICO plaintiff may be likened to a "private attorney general" protecting the public interest, *ibid.*, the Court of Appeals concluded that such claims should be adjudicated only in a judicial forum. It distinguished this Court's reasoning in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614 (1985), concerning the arbitrability of antitrust claims, on the ground that it involved international business transactions and did not affect the law "as applied to agreements to arbitrate arising from domestic transactions." 788 F. 2d, at 98.

With respect to respondents' Exchange Act claims, the Court of Appeals noted that under *Wilko* v. *Swan*, 346 U. S. 427 (1953), claims arising under § 12(2) of the Securities Act of 1933 (Securities Act), 48 Stat. 84, 15 U. S. C. § 77*l*(2), are not subject to compulsory arbitration. The Court of Appeals

observed that it previously had extended the *Wilko* rule to claims arising under § 10(b) of the Exchange Act and Rule 10b–5. See, *e. g.*, *Allegaert* v. *Perot*, 548 F. 2d 432 (CA2), cert. denied, 432 U. S. 910 (1977); *Greater Continental Corp.* v. *Schechter*, 422 F. 2d 1100 (CA2 1970). The court acknowledged that *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974), and *Dean Witter Reynolds Inc.* v. *Byrd, supra,* had "cast some doubt on the applicability of *Wilko* to claims under § 10(b)." 788 F. 2d, at 97. The Court of Appeals nevertheless concluded that it was bound by the "clear judicial precedent in this Circuit," and held that *Wilko* must be applied to Exchange Act claims. 788 F. 2d, at 98.

We granted certiorari, 479 U. S. 812 (1986), to resolve the conflict among the Courts of Appeals regarding the arbitrability of § 10(b)[1] and RICO[2] claims.

## II

The Federal Arbitration Act, 9 U. S. C. § 1 *et seq.*, provides the starting point for answering the questions raised in this case. The Act was intended to "revers[e] centuries of judicial hostility to arbitration agreements," *Scherk* v. *Alberto-Culver Co., supra,* at 510, by "plac[ing] arbitration

[1] Compare 788 F. 2d 94 (CA2 1986) (case below); *Jacobson* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 797 F. 2d 1197 (CA3 1986), cert. pending, No. 86–487; *King* v. *Drexel Burnham Lambert, Inc.*, 796 F. 2d 59 (CA5 1986), cert. pending, No. 86–282; *Sterne* v. *Dean Witter Reynolds, Inc.*, 808 F. 2d 480 (CA6 1987); *Conover* v. *Dean Witter Reynolds, Inc.*, 794 F. 2d 520 (CA9 1986), cert. pending, No. 86–321; and *Wolfe* v. *E. F. Hutton & Co.*, 800 F. 2d 1032 (CA11 1986); with *Page* v. *Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F. 2d 291 (CA1 1986); *Phillips* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 795 F. 2d 1393 (CA8 1986), cert. pending, No. 86–578.

[2] Compare *Page* v. *Moseley, Hallgarten, Estabrook & Weeden, supra;* and 788 F. 2d 94 (CA2 1986) (case below), with *Mayaja, Inc.* v. *Bodkin,* 803 F. 2d 157 (CA5 1986). See also *Jacobson* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra; Tashea* v. *Bache, Halsey, Stuart, Shields, Inc.*, 802 F. 2d 1337 (CA11 1986).

agreements 'upon the same footing as other contracts.'" 417 U. S., at 511, quoting H. R. Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924). The Arbitration Act accomplishes this purpose by providing that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2. The Act also provides that a court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement, § 3; and it authorizes a federal district court to issue an order compelling arbitration if there has been a "failure, neglect, or refusal" to comply with the arbitration agreement, § 4.

The Arbitration Act thus establishes a "federal policy favoring arbitration," *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 24 (1983), requiring that "we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc.* v. *Byrd, supra,* at 221. This duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights. As we observed in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.,* "we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals" should inhibit enforcement of the Act "'in controversies based on statutes.'" 473 U. S., at 626–627, quoting *Wilko* v. *Swan, supra,* at 432. Absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that "would provide grounds 'for the revocation of any contract,'" 473 U. S., at 627, the Arbitration Act "provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability." *Ibid.*

The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command.

The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. See *id.*, at 628. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent "will be deducible from [the statute's] text or legislative history," *ibid.*, or from an inherent conflict between arbitration and the statute's underlying purposes. See *id.*, at 632–637; *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S., at 217.

To defeat application of the Arbitration Act in this case, therefore, the McMahons must demonstrate that Congress intended to make an exception to the Arbitration Act for claims arising under RICO and the Exchange Act, an intention discernible from the text, history, or purposes of the statute. We examine the McMahons' arguments regarding the Exchange Act and RICO in turn.

## III

When Congress enacted the Exchange Act in 1934, it did not specifically address the question of the arbitrability of § 10(b) claims. The McMahons contend, however, that congressional intent to require a judicial forum for the resolution of § 10(b) claims can be deduced from § 29(a) of the Exchange Act, 15 U. S. C. § 78cc(a), which declares void "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of [the Act]."

First, we reject the McMahons' argument that § 29(a) forbids waiver of § 27 of the Exchange Act, 15 U. S. C. § 78aa. Section 27 provides in relevant part:

> "The district courts of the United States . . . shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder."

The McMahons contend that an agreement to waive this jurisdictional provision is unenforceable because § 29(a) voids the waiver of "any provision" of the Exchange Act. The language of § 29(a), however, does not reach so far. What the antiwaiver provision of § 29(a) forbids is enforcement of agreements to waive "compliance" with the provisions of the statute. But § 27 itself does not impose any duty with which persons trading in securities must "comply." By its terms, § 29(a) only prohibits waiver of the substantive obligations imposed by the Exchange Act. Because § 27 does not impose any statutory duties, its waiver does not constitute a waiver of "compliance with any provision" of the Exchange Act under § 29(a).

We do not read *Wilko* v. *Swan*, 346 U. S. 427 (1953), as compelling a different result. In *Wilko*, the Court held that a predispute agreement could not be enforced to compel arbitration of a claim arising under § 12(2) of the Securities Act, 15 U. S. C. § 77*l*(2). The basis for the ruling was § 14 of the Securities Act, which, like § 29(a) of the Exchange Act, declares void any stipulation "to waive compliance with any provision" of the statute. At the beginning of its analysis, the *Wilko* Court stated that the Securities Act's jurisdictional provision was "the kind of 'provision' that cannot be waived under § 14 of the Securities Act." 346 U. S., at 435. This statement, however, can only be understood in the context of the Court's ensuing discussion explaining why arbitration was inadequate as a means of enforcing "the provisions of the Securities Act, advantageous to the buyer." *Ibid.* The conclusion in *Wilko* was expressly based on the Court's belief that a judicial forum was needed to protect the substantive rights created by the Securities Act: "As the protective provisions of the Securities Act require the exercise of judicial direction to fairly assure their effectiveness, it seems to us that Congress must have intended § 14 . . . to apply to waiver of judicial trial and review." *Id.,* at 437. *Wilko* must be understood, therefore, as holding that the plaintiff's waiver

of the "right to select the judicial forum," *id.*, at 435, was un-enforceable only because arbitration was judged inadequate to enforce the statutory rights created by § 12(2).

Indeed, any different reading of *Wilko* would be inconsistent with this Court's decision in *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974). In *Scherk*, the Court upheld enforcement of a predispute agreement to arbitrate Exchange Act claims by parties to an international contract. The *Scherk* Court assumed for purposes of its opinion that *Wilko* applied to the Exchange Act, but it determined that an international contract "involve[d] considerations and policies significantly different from those found controlling in *Wilko*." 417 U. S., at 515. The Court reasoned that arbitration reduced the uncertainty of international contracts and obviated the danger that a dispute might be submitted to a hostile or unfamiliar forum. At the same time, the Court noted that the advantages of judicial resolution were diminished by the possibility that the opposing party would make "speedy resort to a foreign court." *Id.*, at 518. The decision in *Scherk* thus turned on the Court's judgment that under the circumstances of that case, arbitration was an adequate substitute for adjudication as a means of enforcing the parties' statutory rights. *Scherk* supports our understanding that *Wilko* must be read as barring waiver of a judicial forum only where arbitration is inadequate to protect the substantive rights at issue. At the same time, it confirms that where arbitration does provide an adequate means of enforcing the provisions of the Exchange Act, § 29(a) does not void a predispute waiver of § 27—*Scherk* upheld enforcement of just such a waiver.

The second argument offered by the McMahons is that the arbitration agreement effects an impermissible waiver of the substantive protections of the Exchange Act. Ordinarily, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather

than a judicial, forum." *Mitsubishi Motors Corp.* v. *Soler-Chrysler-Plymouth, Inc.*, 473 U. S., at 628. The McMahons argue, however, that § 29(a) compels a different conclusion. Initially, they contend that predispute agreements are void under § 29(a) because they tend to result from broker over-reaching. They reason, as do some commentators, that *Wilko* is premised on the belief "that arbitration clauses in securities sales agreements generally are not freely negotiated." See, *e. g.*, Sterk, Enforceability of Agreements to Arbitrate: An Examination of the Public Policy Defense, 2 Cardozo L. Rev. 481, 519 (1981). According to this view, *Wilko* barred enforcement of predispute agreements because of this frequent inequality of bargaining power, reasoning that Congress intended for § 14 generally to ensure that sellers did not "maneuver buyers into a position that might weaken their ability to recover under the Securities Act." 346 U. S., at 432. The McMahons urge that we should interpret § 29(a) in the same fashion.

We decline to give *Wilko* a reading so far at odds with the plain language of § 14, or to adopt such an unlikely interpretation of § 29(a). The concern that § 29(a) is directed against is evident from the statute's plain language: it is a concern with whether an agreement "waive[s] compliance with [a] provision" of the Exchange Act. The voluntariness of the agreement is irrelevant to this inquiry: if a stipulation waives compliance with a statutory duty, it is void under § 29(a), whether voluntary or not. Thus, a customer cannot negotiate a reduction in commissions in exchange for a waiver of compliance with the requirements of the Exchange Act, even if the customer knowingly and voluntarily agreed to the bargain. Section 29(a) is concerned, not with whether brokers "maneuver[ed customers] into" an agreement, but with whether the agreement "weaken[s] their ability to recover under the [Exchange] Act." 346 U. S., at 432. The former is grounds for revoking the contract under ordinary

principles of contract law; the latter is grounds for voiding the agreement under § 29(a).

The other reason advanced by the McMahons for finding a waiver of their § 10(b) rights is that arbitration does "weaken their ability to recover under the [Exchange] Act." *Ibid.* That is the heart of the Court's decision in *Wilko,* and respondents urge that we should follow its reasoning. *Wilko* listed several grounds why, in the Court's view, the "effectiveness [of the Act's provisions] in application is lessened in arbitration." 346 U. S., at 435. First, the *Wilko* Court believed that arbitration proceedings were not suited to cases requiring "subjective findings on the purpose and knowledge of an alleged violator." *Id.,* at 435–436. *Wilko* also was concerned that arbitrators must make legal determinations "without judicial instruction on the law," and that an arbitration award "may be made without explanation of [the arbitrator's] reasons and without a complete record of their proceedings." *Id.,* at 436. Finally, *Wilko* noted that the "[p]ower to vacate an award is limited," and that "interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation." *Id.,* at 436–437. *Wilko* concluded that in view of these drawbacks to arbitration, § 12(2) claims "require[d] the exercise of judicial direction to fairly assure their effectiveness." *Id.,* at 437.

As Justice Frankfurter noted in his dissent in *Wilko,* the Court's opinion did not rest on any evidence, either "in the record . . . [or] in the facts of which [it could] take judicial notice," that "the arbitral system . . . would not afford the plaintiff the rights to which he is entitled." *Id.,* at 439. Instead, the reasons given in *Wilko* reflect a general suspicion of the desirability of arbitration and the competence of arbitral tribunals—most apply with no greater force to the arbitration of securities disputes than to the arbitration of legal disputes generally. It is difficult to reconcile *Wilko*'s mistrust of the arbitral process with this Court's subsequent

decisions involving the Arbitration Act. See, *e. g., Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc., supra; Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213 (1985); *Southland Corp.* v. *Keating*, 465 U. S. 1 (1984); *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1 (1983); *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974).

Indeed, most of the reasons given in *Wilko* have been rejected subsequently by the Court as a basis for holding claims to be nonarbitrable. In *Mitsubishi*, for example, we recognized that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision. See 473 U. S., at 633–634. Likewise, we have concluded that the streamlined procedures of arbitration do not entail any consequential restriction on substantive rights. *Id.*, at 628. Finally, we have indicated that there is no reason to assume at the outset that arbitrators will not follow the law; although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute. See *id.*, at 636–637, and n. 19 (declining to assume that arbitration will not be resolved in accordance with statutory law, but reserving consideration of "effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinstate suit in federal court").

The suitability of arbitration as a means of enforcing Exchange Act rights is evident from our decision in *Scherk*. Although the holding in that case was limited to international agreements, the competence of arbitral tribunals to resolve § 10(b) claims is the same in both settings. Courts likewise have routinely enforced agreements to arbitrate § 10(b) claims where both parties are members of a securities exchange or the National Association of Securities Dealers (NASD), suggesting that arbitral tribunals are fully capable of handling such matters. See, *e. g., Axelrod & Co.* v. *Kordich, Victor*

*& Neufeld,* 320 F. Supp. 193 (SDNY 1970), aff'd, 451 F. 2d 838 (CA2 1971); *Brown* v. *Gilligan, Will & Co.,* 287 F. Supp. 766 (SDNY 1968). And courts uniformly have concluded that *Wilko* does not apply to the submission to arbitration of existing disputes, see, *e. g., Gardner* v. *Shearson, Hammill & Co.,* 433 F. 2d 367 (CA5 1970); *Moran* v. *Paine, Webber, Jackson & Curtis,* 389 F. 2d 242 (CA3 1968), even though the inherent suitability of arbitration as a means of resolving § 10(b) claims remains unchanged. Cf. *Mitsubishi,* 473 U. S., at 633.

Thus, the mistrust of arbitration that formed the basis for the *Wilko* opinion in 1953 is difficult to square with the assessment of arbitration that has prevailed since that time. This is especially so in light of the intervening changes in the regulatory structure of the securities laws. Even if *Wilko*'s assumptions regarding arbitration were valid at the time *Wilko* was decided, most certainly they do not hold true today for arbitration procedures subject to the SEC's oversight authority.

In 1953, when *Wilko* was decided, the Commission had only limited authority over the rules governing self-regulatory organizations (SROs)—the national securities exchanges and registered securities associations—and this authority appears not to have included any authority at all over their arbitration rules. See Brief for Securities and Exchange Commission as *Amicus Curiae* 14–15. Since the 1975 amendments to § 19 of the Exchange Act, however, the Commission has had expansive power to ensure the adequacy of the arbitration procedures employed by the SROs. No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act, 15 U. S. C. § 78s(b)(2); and the Commission has the power, on its own initiative, to "abrogate, add to, and delete from" any SRO rule if it finds such changes necessary or appropriate to further the objectives of the Act, 15 U. S. C. § 78s(c). In short, the Commission has broad authority to oversee and to

regulate the rules adopted by the SROs relating to customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights.[3]

In the exercise of its regulatory authority, the SEC has specifically approved the arbitration procedures of the New York Stock Exchange, the American Stock Exchange, and the NASD, the organizations mentioned in the arbitration agreement at issue in this case. We conclude that where, as in this case, the prescribed procedures are subject to the Commission's § 19 authority, an arbitration agreement does not effect a waiver of the protections of the Act. While *stare decisis* concerns may counsel against upsetting *Wilko*'s contrary conclusion under the Securities Act, we refuse to extend *Wilko*'s reasoning to the Exchange Act in light of these intervening regulatory developments. The McMahons' agreement to submit to arbitration therefore is not tantamount to an impermissible waiver of the McMahons' rights under § 10(b), and the agreement is not void on that basis under § 29(a).

The final argument offered by the McMahons is that even if § 29(a) as enacted does not void predispute arbitration agreements, Congress subsequently has indicated that it desires § 29(a) to be so interpreted. According to the McMahons, Congress expressed this intent when it failed to make more

---

[3] The McMahons contend that Securities Exchange Act Rel. No. 15984 (1979), [1979 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 82,122, and SEC Rule 15c2-2, 17 CFR § 240.15c2-2 (1986), provide authority for the view that § 29(a) bars enforcement of predispute arbitration agreements. We agree with the Commission, however, that its actions were not based on any independent analysis of § 29(a), but instead "were premised on the Commission's assumption, based on court of appeals decisions following *Wilko*, . . . that agreements to arbitrate Rule 10b-5 claims were not, in fact, enforceable." Brief for Securities and Exchange Commission as *Amicus Curiae* 18, n. 13 (citation omitted). The SEC's actions therefore do not cast any additional light on the question of the arbitrability of Exchange Act claims.

extensive changes to §28(b), 15 U. S. C. §78bb(b), in the 1975 amendments to the Exchange Act. Before its amendment, §28(b) provided in relevant part:

"Nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between its members, or (2) with regard to the binding effect of such action on any person who has agreed to be bound thereby, or (3) with regard to the binding effect on any such member of any disciplinary action taken by the authorities of the exchange." 48 Stat. 903.

The chief aim of this provision was to preserve the self-regulatory role of the securities exchanges, by giving the exchanges a means of enforcing their rules against their members. See, *e. g.*, *Tullis* v. *Kohlmeyer & Co.*, 551 F. 2d 632, 638 (CA5 1977) ("[P]reserv[ing] for the stock exchanges a major self-regulatory role . . . is the basis of §28(b)"); *Axelrod & Co.* v. *Kordich, Victor & Neufeld*, 451 F. 2d, at 840–841. In 1975, Congress made extensive revisions to the Exchange Act intended to "clarify the scope of the self-regulatory responsibilities of national securities exchanges and registered securities associations . . . and the manner in which they are to exercise those responsibilities." S. Rep. No. 94–75, p. 22 (1975). In making these changes, the Senate Report observed: "The self-regulatory organizations must exercise governmental-type powers if they are to carry out their responsibilities under the Exchange Act. When a member violates the Act or a self-regulatory organization's rules, the organization must be in a position to impose appropriate penalties or to revoke relevant privileges." *Id.*, at 24.

The amendments to §28 reflect this objective. Paragraph (3) of §28(b) was deleted and replaced with new §28(c), which provided that the validity of any disciplinary action taken by an SRO would not be affected by a subsequent decision by the SEC to stay or modify the sanction. See 15 U. S. C.

§ 78bb(c). At the same time, § 28(b) was expanded to en-
sure that all SROs as well as the Municipal Securities Rule-
making Board had the power to enforce their substantive
rules against their members. Section 28(b), as amended,
provides:

> "Nothing in this chapter shall be construed to modify
> existing law with regard to the binding effect (1) on any
> member of or participant in any self-regulatory orga-
> nization of any action taken by the authorities of such
> organization to settle disputes between its members
> or participants, (2) on any municipal securities dealer or
> municipal securities broker of any action taken pursuant
> to a procedure established by the Municipal Securities
> Rulemaking Board to settle disputes between municipal
> securities dealers and municipal securities brokers, or
> (3) of any action described in paragraph (1) or (2) on any
> person who has agreed to be bound thereby."

Thus, the amended version of § 28(b), like the original, men-
tions neither customers nor arbitration. It is directed at
an entirely different problem: enhancing the self-regulatory
function of the SROs under the Exchange Act.

The McMahons nonetheless argue that we should find it
significant that Congress did *not* take this opportunity to ad-
dress the general question of the arbitrability of Exchange
Act claims. Their argument is based entirely on a sentence
from the Conference Report, which they contend amounts to
a ratification of *Wilko*'s extension to Exchange Act claims.
The Conference Report states:

> "The Senate bill amended section 28 of the Securities
> Exchange Act of 1934 with respect to arbitration pro-
> ceedings between self-regulatory organizations and their
> participants, members, or persons dealing with members
> or participants. The House amendment contained no
> comparable provision. The House receded to the Sen-
> ate. It was the clear understanding of the conferees that

this amendment did not change existing law, as articulated in *Wilko* v. *Swan*, 346 U. S. 427 (1953), concerning the effect of arbitration proceedings provisions in agreements entered into by persons dealing with members and participants of self-regulatory organizations." H. R. Conf. Rep. No. 94–229, p. 111 (1975).

The McMahons contend that the conferees would not have acknowledged *Wilko* in a revision of the Exchange Act unless they were aware of lower court decisions extending *Wilko* to § 10(b) claims and intended to approve them. We find this argument fraught with difficulties. We cannot see how Congress could extend *Wilko* to the Exchange Act without enacting into law any provision remotely addressing that subject. See *Train* v. *City of New York*, 420 U. S. 35, 45 (1975). And even if it could, there is little reason to interpret the Report as the McMahons suggest. At the outset, the committee may well have mentioned *Wilko* for a reason entirely different from the one postulated by the McMahons—lower courts had applied § 28(b) to the Securities Act, see, *e. g., Axelrod & Co.* v. *Kordich, Victor & Neufeld, supra,* at 843, and the committee may simply have wished to make clear that the amendment to § 28(b) was not otherwise intended to affect *Wilko's* construction of the Securities Act. Moreover, even if the committee were referring to the arbitrability of § 10(b) claims, the quoted sentence does not disclose what committee members thought "existing law" provided. The conference members might have had in mind the two Court of Appeals decisions extending *Wilko* to the Exchange Act, as the McMahons contend. See *Greater Continental Corp.* v. *Schechter*, 422 F. 2d 1100 (CA2 1970); *Moran* v. *Paine, Webber, Jackson & Curtis*, 389 F. 2d 242 (CA3 1968). It is equally likely, however, that the committee had in mind this Court's decision the year before expressing doubts as to whether *Wilko* should be extended to § 10 (b) claims. See *Scherk* v. *Alberto-Culver Co.*, 417 U. S., at 513 ("[A] colorable argument could be made that even the

semantic reasoning of the *Wilko* opinion does not control [a case based on § 10(b)]"). Finally, even assuming the conferees had an understanding of existing law that all agreed upon, they specifically disclaimed any intent to change it. Hence, the *Wilko* issue was left to the courts: it was unaffected by the amendment to § 28(b). This statement of congressional inaction simply does not support the proposition that the 1975 Congress intended to engraft onto unamended § 29(a) a meaning different from that of the enacting Congress.

We conclude, therefore, that Congress did not intend for § 29(a) to bar enforcement of all predispute arbitration agreements. In this case, where the SEC has sufficient statutory authority to ensure that arbitration is adequate to vindicate Exchange Act rights, enforcement does not effect a waiver of "compliance with any provision" of the Exchange Act under § 29(a). Accordingly, we hold the McMahons' agreements to arbitrate Exchange Act claims "enforce[able] . . . in accord with the explicit provisions of the Arbitration Act." *Scherk* v. *Alberto-Culver Co., supra,* at 520.

## IV

Unlike the Exchange Act, there is nothing in the text of the RICO statute that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act. This silence in the text is matched by silence in the statute's legislative history. The private treble-damages provision codified as 18 U. S. C. § 1964(c) was added to the House version of the bill after the bill had been passed by the Senate, and it received only abbreviated discussion in either House. See *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 486–488 (1985). There is no hint in these legislative debates that Congress intended for RICO treble-damages claims to be excluded from the ambit of the Arbitration Act. See *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.,*

815 F. 2d 840, 850–851 (CA2 1987); *Mayaja, Inc.* v. *Bodkin,* 803 F. 2d 157, 164 (CA5 1986).

Because RICO's text and legislative history fail to reveal any intent to override the provisions of the Arbitration Act, the McMahons must argue that there is an irreconcilable conflict between arbitration and RICO's underlying purposes. Our decision in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.,* 473 U. S. 614 (1985), however, already has addressed many of the grounds given by the McMahons to support this claim. In *Mitsubishi,* we held that nothing in the nature of the federal antitrust laws prohibits parties from agreeing to arbitrate antitrust claims arising out of international commercial transactions. Although the holding in *Mitsubishi* was limited to the international context, see *id.,* at 629, much of its reasoning is equally applicable here. Thus, for example, the McMahons have argued that RICO claims are too complex to be subject to arbitration. We determined in *Mitsubishi,* however, that "potential complexity should not suffice to ward off arbitration." *Id.,* at 633. Antitrust matters are every bit as complex as RICO claims, but we found that the "adaptability and access to expertise" characteristic of arbitration rebutted the view "that an arbitral tribunal could not properly handle an antitrust matter." *Id.,* at 633–634.

Likewise, the McMahons contend that the "overlap" between RICO's civil and criminal provisions renders § 1964(c) claims nonarbitrable. See *Page* v. *Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 806 F. 2d 291, 299, n. 13 (CA1 1986) ("[T]he makings of a 'pattern of racketeering' are not yet clear, but the fact remains that a 'pattern' for civil purposes is a 'pattern' for criminal purposes"). Yet § 1964(c) is no different in this respect from the federal antitrust laws. In *Sedima, S. P. R. L.* v. *Imrex Co., supra,* we rejected the view that § 1964(c) "provide[s] civil remedies for offenses criminal in nature." See 473 U. S., at 492. In doing so, this Court observed: "[T]he fact that conduct can result in

both criminal liability and treble damages does not mean that there is not a bona fide civil action. The familiar provisions for both criminal liability and treble damages under the antitrust laws indicate as much." *Ibid.* *Mitsubishi* recognized that treble-damages suits for claims arising under § 1 of the Sherman Act may be subject to arbitration, even though such conduct may also give rise to claims of criminal liability. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc., supra.* We similarly find that the criminal provisions of RICO do not preclude arbitration of bona fide civil actions brought under § 1964(c).

The McMahons' final argument is that the public interest in the enforcement of RICO precludes its submission to arbitration. *Mitsubishi* again is relevant to the question. In that case we thoroughly examined the legislative intent behind § 4 of the Clayton Act in assaying whether the importance of the private treble-damages remedy in enforcing the antitrust laws precluded arbitration of § 4 claims. We found that "[n]otwithstanding its important incidental policing function, the treble-damages cause of action . . . seeks primarily to enable an injured competitor to gain compensation for that injury." 473 U. S., at 635. Emphasizing the priority of the compensatory function of § 4 over its deterrent function, *Mitsubishi* concluded that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.*, at 637.

The legislative history of § 1964(c) reveals the same emphasis on the remedial role of the treble-damages provision. In introducing the treble-damages provision to the House Judiciary Committee, Representative Steiger stressed that "those who have been wronged by organized crime should at least be given access to a legal remedy." Hearings on S. 30 and Related Proposals before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 520 (1970). The policing function of § 1964(c), although impor-

tant, was a secondary concern. See *ibid.* ("In addition, the availability of such a remedy would enhance the effectiveness of title IX's prohibitions"). During the congressional debates on § 1964(c), Representative Steiger again emphasized the remedial purpose of the provision: "It is the intent of this body, I am certain, to see that innocent parties who are the victims of organized crime have a right to obtain proper redress. . . . It represents the one opportunity for those of us who have been seriously affected by organized crime activity to recover." 116 Cong. Rec. 35346–35347 (1970). This focus on the remedial function of § 1964(c) is reinforced by the recurrent references in the legislative debates to § 4 of the Clayton Act as the model for the RICO treble-damages provision. See, *e. g.*, 116 Cong. Rec. 35346 (statement of Rep. Poff) (RICO provision "has its counterpart almost in haec verba in the antitrust statutes"); *id.*, at 25190 (statement of Sen. McClellan) (proposed amendment would "authorize private civil damage suits based upon the concept of section 4 of the Clayton Antitrust Act"). See generally *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S., at 489 ("The clearest current in [RICO's] history is the reliance on the Clayton Act model").

Not only does *Mitsubishi* support the arbitrability of RICO claims, but there is even more reason to suppose that arbitration will adequately serve the purposes of RICO than that it will adequately protect private enforcement of the antitrust laws. Antitrust violations generally have a widespread impact on national markets as a whole, and the antitrust treble-damages provision gives private parties an incentive to bring civil suits that serve to advance the national interest in a competitive economy. See Lindsay, "Public" Rights and Private Forums: Predispute Arbitration Agreements and Securities Litigation, 20 Loyola (LA) L. Rev. 643, 691–692 (1987). RICO's drafters likewise sought to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime. See *Sedima,*

*S. P. R. L.* v. *Imrex Co., supra,* at 498. But in fact RICO actions are seldom asserted "against the archetypal, intimidating mobster." *Id.,* at 499; see also *id.,* at 506 (MARSHALL, J., dissenting) ("[O]nly 9% of all civil RICO cases have involved allegations of criminal activity normally associated with professional criminals"). The special incentives necessary to encourage civil enforcement actions against organized crime do not support nonarbitrability of run-of-the-mill civil RICO claims brought against legitimate enterprises. The private attorney general role for the typical RICO plaintiff is simply less plausible than it is for the typical antitrust plaintiff, and does not support a finding that there is an irreconcilable conflict between arbitration and enforcement of the RICO statute.

In sum, we find no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims. The McMahons may effectively vindicate their RICO claim in an arbitral forum, and therefore there is no inherent conflict between arbitration and the purposes underlying § 1964(c). Moreover, nothing in RICO's text or legislative history otherwise demonstrates congressional intent to make an exception to the Arbitration Act for RICO claims. Accordingly, the McMahons, "having made the bargain to arbitrate," will be held to their bargain. Their RICO claim is arbitrable under the terms of the Arbitration Act.

## V

Accordingly, the judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

I concur in the Court's decision to enforce the arbitration agreement with respect to respondents' RICO claims and thus

join Parts I, II, and IV of the Court's opinion. I disagree, however, with the Court's conclusion that respondents' § 10(b) claims also are subject to arbitration.

Both the Securities Act of 1933 and the Securities Exchange Act of 1934 were enacted to protect investors from predatory behavior of securities industry personnel. In *Wilko* v. *Swan*, 346 U. S. 427 (1953), the Court recognized this basic purpose when it declined to enforce a predispute agreement to compel arbitration of claims under the Securities Act. Following that decision, lower courts extended *Wilko*'s reasoning to claims brought under § 10(b) of the Exchange Act, and Congress approved of this extension. In today's decision, however, the Court effectively overrules *Wilko* by accepting the Securities and Exchange Commission's newly adopted position that arbitration procedures in the securities industry and the Commission's oversight of the self-regulatory organizations (SROs) have improved greatly since *Wilko* was decided. The Court thus approves the abandonment of the judiciary's role in the resolution of claims under the Exchange Act and leaves such claims to the arbitral forum of the securities industry at a time when the industry's abuses towards investors are more apparent than ever.

I

At the outset, it is useful to review the manner by which the issue decided today has been kept alive inappropriately by this Court. As the majority explains, *Wilko* was limited to the holding "that a predispute agreement could not be enforced to compel arbitration of a claim arising under § 12(2) of the Securities Act." *Ante,* at 228. Relying, however, on the reasoning of *Wilko* and the similarity between the pertinent provisions of the Securities Act and those of the Exchange Act, lower courts extended the *Wilko* holding to claims under the Exchange Act and refused to enforce predispute agreements to arbitrate them as well. See, *e. g.*, *Greater Continental Corp.* v. *Schechter*, 422 F. 2d 1100, 1103

(CA2 1970) (dicta); *Moran* v. *Paine, Webber, Jackson & Curtis,* 389 F. 2d 242, 245–246 (CA3 1968).

In *Scherk* v. *Alberto-Culver Co.,* 417 U. S. 506 (1974), the Court addressed the question whether a particular predispute agreement to arbitrate § 10(b) claims should be enforced. Because that litigation involved international business concerns and because the case was decided on such grounds, the Court did not reach the issue of the extension of *Wilko* to § 10(b) claims. The Court, nonetheless, included in its opinion dicta noting that "a colorable argument could be made that even the semantic reasoning of the *Wilko* opinion does not control the case before us." 417 U. S., at 513. There is no need to discuss in any detail that "colorable argument," which rests on alleged distinctions between pertinent provisions of the Securities Act and those of the Exchange Act, because the Court does not rely upon it today.[1] In fact,

---

[1] The "colorable argument" amounted to a listing by the *Scherk* Court of the differences between a § 12(2) action, as it had been described by the *Wilko* Court, and a § 10(b) action under the Exchange Act. First, the Court noted that, while § 12(2) of the Securities Act provided an *express* cause of action, § 10(b) did not contain on its face such a cause of action, which, instead, had been implied from its language and that of Rule 10b-5. *Scherk* v. *Alberto-Culver Co.,* 417 U. S. 506, 513 (1974). Second, the Court explained that the Exchange Act did not set forth the "special right" that the *Wilko* Court found established in § 12(2). 417 U. S., at 513–514; see also *Wilko* v. *Swan,* 346 U. S. 427, 431 (1953) (§ 12(2) right viewed as "special" because of differences between that right and a common-law cause of action, differences that favored the investor). Finally, the Court observed that the jurisdictional provisions of the two Acts were not the same. 417 U. S., at 514. Under § 22(a) of the Securities Act, 48 Stat. 86, as amended, 15 U. S. C. § 77v(a), suit could be brought in federal or state court, whereas, under § 27 of the Exchange Act, 48 Stat. 902, as amended, 15 U. S. C. § 78aa, suit could be brought only in federal court. In sum, the overall thrust of the "colorable argument," as stated by the Court in *Scherk,* seemed to be as follows: The *Wilko* Court declined to enforce arbitration of § 12(2) claims because it found significant the special nature of that cause of action, but a similar concern does not apply to § 10(b) claims, which are neither "special" nor "express."

the "argument" is important not so much for its substance[2] as it is for its litigation role. It simply constituted a way of keeping the issue of the arbitrability of § 10(b) claims alive for those opposed to the result in *Wilko*.

---

[2] That the Court passes over the "colorable argument" in silence, although petitioners have advanced it, see Brief for Petitioners 19–28, would appear to relegate that argument to its proper place in the graveyard of ideas. As the Commission explains in its brief, see Brief for Securities and Exchange Commission as *Amicus Curiae* 22–23, and nn. 18–19 (Brief), the procedural protections surrounding a § 10(b) action and its difference from a common-law action are as pronounced as those of a § 12(2) claim. More importantly, "Section 10(b) is just as much a 'provision' of the 1934 Act, with which persons trading in securities are required to 'comply,' as Section 12(2) is of the 1933 Act." Brief 24. To state otherwise "might be interpreted as suggesting that the Section 10(b) implied right of action is somehow inferior to express rights," which is "incompatible with the importance of the Section 10(b) remedy in the arsenal of securities law protections." *Id.*, at 26. And the difference in the jurisdictional provisions is not significant: as the Commission explains, the proper question is whether a § 10(b) or § 12(2) claimant is entitled to a judicial forum, not whether the claimant has a choice between judicial fora. Brief 22, n. 17. In fact, the limitation of § 10(b) actions to federal court argues *against* enforcing predispute arbitration agreements as to such actions. Because Congress gave the federal courts exclusive jurisdiction over § 10(b) claims, it may have intended them to develop an exclusive jurisprudence of § 10(b). See, *e. g.*, *Conover* v. *Dean Witter Reynolds, Inc.*, 794 F. 2d 520, 527 (CA9 1986), cert. pending, No. 86–321.

Commentators, almost uniformly, have rejected the "colorable argument." See, *e. g.*, Comment, Predispute Arbitration Agreements Between Brokers and Investors: The Extension of *Wilko* to Section 10(b) Claims, 46 Md. L. Rev. 339, 364–366 (1987) (Maryland Comment); Brown, Shell, & Tyson, Arbitration of Customer-Broker Disputes Arising Under the Federal Securities Laws and RICO, 15 Sec. Reg. L. J. 3, 18–19 (1987) (Brown, Shell, & Tyson); Malcolm & Segall, The Arbitrability of Claims Arising Under Section 10(b) of the Securities Exchange Act: Should *Wilko* Be Extended?, 50 Albany L. Rev. 725, 748–751 (1986) (Malcolm & Segall); Note, Arbitrability of Claims Arising Under the Securities Exchange Act of 1934, 1986 Duke L. J. 548, 565–570 (Duke Note). But see Note, Arbitrability of Implied Rights of Action Under Section 10(b) of the Securities Exchange Act, 61 N. Y. U. L. Rev. 506, 520–526 (1986).

If, however, there could have been any doubts about the extension of *Wilko*'s holding to § 10(b) claims, they were undermined by Congress in its 1975 amendments to the Exchange Act. The Court questions the significance of these amendments, which, as it notes, concerned, among other things, provisions dealing with dispute resolution and disciplinary action by an SRO towards its own members. See *ante,* at 235–236. These amendments, however, are regarded as "the 'most substantial and significant revision of this country's Federal securities laws since the passage of the Securities Exchange Act in 1934.'" *Herman & MacLean* v. *Huddleston,* 459 U. S. 375, 384–385 (1983), quoting Securities Acts Amendments of 1975: Hearings on S. 249 before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 1st Sess., 1 (1975) (Hearings).[3] More importantly, in enacting these amendments, Congress specifically was considering exceptions to § 29(a), 15 U. S. C. § 78cc, the nonwaiver provision of the Exchange Act, a provision primarily designed with the protection of investors in mind.[4] The statement from the

---

[3] Senator Williams, Chairman of the Subcommittee, observed:

"This legislation represents the product of nearly 4 years of studies, investigations, and hearings. It has been carefully designed to improve the efficiency of the securities markets and to increase investor protection. It is reform legislation in the very best sense, for it will lay the foundation for a stronger and more profitable securities industry while assuring that investors are more economically and effectively served." Hearings 1.

[4] The text of one of the amendments suggests that Congress had investors in mind when making them. Although, as the Court observes, *ante,* at 235–236, § 28(b) deals only with disputes among securities-industry professionals, the amendment to § 15B, which permitted arbitration among municipal-securities brokers-dealers, provided that "no person other than a municipal securities broker, municipal securities dealer, or person associated with such a municipal securities broker or municipal securities dealer may be compelled to submit to such arbitration except at his instance and in accordance with section 29 of this title." 89 Stat. 133, 15 U. S. C. § 78o–4(b)(2)(D); see also Brown, Shell, & Tyson, at 20.

legislative history, cited by the Court, *ante*, at 236–237, on its face indicates that Congress did not want the amendments to overrule *Wilko*. Moreover, the fact that this statement was made in an amendment to the Exchange Act suggests that Congress was aware of the extension of *Wilko* to § 10(b) claims. Although the remark does not necessarily signify Congress' endorsement of this extension, in the absence of any prior congressional indication to the contrary, it implies that Congress was not concerned with arresting this trend.[5] Such inaction during a wholesale revision of the securities laws, a revision designed to further investor protection, would argue in favor of Congress' approval of *Wilko* and its extension to § 10(b) claims. See *Wolfe* v. *E. F. Hutton & Co.*, 800 F. 2d 1032, 1037–1038 (CA11 1986) (en banc), cert.

---

[5] Although I agree that the remark from the legislative history does not state expressly Congress' approval of *Wilko*'s extension to Exchange Act claims, I do not believe that there are "difficulties," as the Court suggests, in interpreting that remark to suggest such approval. See *ante*, at 237. Certainly, by the 1975 amendments dealing with exceptions to § 29(a) of the Exchange Act, Congress was enacting provisions *directly* related to the general subject of *Wilko* and its extension to Exchange Act claims—the scope of the nonwaiver provision—contrary to the Court's flat statement that these provisions were not "remotely addressing that subject," see *ante*, at 237. Moreover, understanding the remark to imply Congress' affirmation of *Wilko* and an awareness of *Wilko*'s extension to § 10(b) claims is not incompatible with several of the concerns at the center of the Court's "difficulties." Thus, Congress' concern that a possible misreading of § 28(b) might affect *Wilko*'s actual holding as to § 12(2) claims, see *ante*, at 237–238, is consistent with this understanding. In addition, the mention of "existing law" could very well have referred both to the Court's decision in *Scherk*, where the Court assumed that *Wilko* could be applied to § 10(b) claims, see 417 U. S., at 515, and to holdings by the lower courts. I disagree with the Court's assertion that Congress left the *Wilko* issue to the courts by way of its statement that it did not change existing law. *Ante*, at 238. Common sense suggests that, when Congress states that it is not changing the law, while at the same time undertaking *extensive* amendments to a particular area of the law, one can assume that Congress is approving the law in existence. See *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 384–386 (1983).

pending, No. 86–1218; cf. *Herman & MacLean* v. *Huddleston*, 459 U. S., at 384–386.

One would have thought that, after these amendments, the matter of *Wilko*'s extension to Exchange Act claims at last would be uncontroversial. In the years following the *Scherk* decision, *all* the Courts of Appeals treating the issue so interpreted *Wilko*.[6] In *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213 (1985), this Court declined to address the extension issue, which was not before it, but recognized the development in the case law. *Id.*, at 215, n. 1. Yet, like a ghost reluctant to accept its eternal rest, the "colorable argument" surfaced again, this time in a concurring opinion. See *id.*, at 224 (WHITE, J.). That concurring opinion repeated the "argument," but with no more development than the *Scherk* Court had given it.[7] Where there had been uniformity in

---

[6] See *Raiford* v. *Buslease Inc.*, 745 F. 2d 1419, 1421 (CA11 1984); *Surman* v. *Merrill Lynch, Pierce, Fenner & Smith*, 733 F. 2d 59, 61 (CA8 1984) (dictum); *Ingbar* v. *Drexel Burnham Lambert Inc.*, 683 F. 2d 603, 605 (CA1 1982) (same); *De Lancie* v. *Birr, Wilson & Co.*, 648 F. 2d 1255, 1257–1259 (CA9 1981) (same); *Mansbach* v. *Prescott, Ball & Turben*, 598 F. 2d 1017, 1030 (CA6 1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Moore*, 590 F. 2d 823, 827–829 (CA10 1978); *Weissbuch* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 558 F. 2d 831, 833–836 (CA7 1977); *Allegaert* v. *Perot*, 548 F. 2d 432, 437–438 (CA2), cert. denied, 432 U. S. 910 (1977); *Sibley* v. *Tandy Corp.*, 543 F. 2d 540, 543, and n. 3 (CA5 1976), cert. denied, 434 U. S. 824 (1977); *Ayres* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F. 2d 532, 536–537 (CA3), cert. denied, 429 U. S. 1010 (1976).

[7] Although in his concurrence, JUSTICE WHITE observed that the application of *Wilko* to § 10(b) claims was a "matter of substantial doubt," *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S., at 224, and stated that "the contrary holdings of the lower courts must be viewed with some doubt," *id.*, at 225, the only reasons offered for these assertions were those of the *Scherk* Court. The concurring opinion nowhere discussed the reasoning of the lower courts' subsequent decisions, particularly their justification for the extension of *Wilko* because of the similar concern for the protection of investors that informed both the Securities Act and the Exchange Act. See, *e. g.*, *Weissbuch* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 558 F. 2d, at 835.

the lower courts before *Byrd*, there now appeared disharmony on the issue of the arbitrability of § 10(b) claims.[8] And, as the Court observes, see *ante*, at 225, we granted certiorari in this case to resolve this conflict among the Courts of Appeals.

## II

There are essentially two problems with the Court's conclusion that predispute agreements to arbitrate § 10(b) claims may be enforced. First, the Court gives *Wilko* an overly narrow reading so that it can fit into the syllogism offered by the Commission and accepted by the Court, namely, (1) *Wilko*

---

[8] In the wake of the *Byrd* decision, the "colorable argument" took on another life as courts followed the suggestion of the concurrence. See, *e. g., Page* v. *Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F. 2d 291, 296–298 (CA1 1986); *Phillips* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 795 F. 2d 1393, 1397–1398 (CA8 1986), cert. pending, No. 86–578; see also Duke Note 548, n. 7 (citing Federal District Court cases). It is somewhat curious that this "colorable argument" was taken up by many lower courts, often without any analysis on this point, even though the Court in *Byrd* specifically declined to address the issue, which was not before it. See 470 U. S., at 215, n. 1.

Other courts reaffirmed their pre-*Byrd* holdings that § 10(b) claims were nonarbitrable. See *Sterne* v. *Dean Witter Reynolds, Inc.*, 808 F. 2d 480, 483 (CA6 1987); *Jacobson* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 797 F. 2d 1197, 1202 (CA3 1986), cert. pending, No. 86–487; *King* v. *Drexel Burnham Lambert, Inc.*, 796 F. 2d 59, 60 (CA5 1986), cert. pending, No. 86–282; 788 F. 2d 94, 98 (CA2 1986) (case below). Two courts, which reexamined the issue, came to the same result on the basis of the similarities between the provisions of both Acts and the policies underlying them. See *Conover* v. *Dean Witter Reynolds, Inc.*, 794 F. 2d, at 527; *Wolfe* v. *E. F. Hutton & Co.*, 800 F. 2d 1032, 1036–1037 (CA11 1986) (en banc), cert. pending, No. 86–1218.

To a certain extent, the new popularity of the "colorable argument" was not unrelated to the belief that the judicial attitude toward arbitration had changed and that *Wilko* should be reconsidered because of this change. See *Phillips* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 795 F. 2d, at 1395, 1398, n. 16. One commentator observed: "The differences adduced by Justice White merely act as a wedge to hold the door open for this policy favoring arbitration." Maryland Comment 356, n. 149.

was really a case concerning whether arbitration was adequate for the enforcement of the substantive provisions of the securities laws; (2) all of the *Wilko* Court's doubts as to arbitration's adequacy are outdated; (3) thus *Wilko* is no longer good law. See *ante*, at 228–229, 232; Brief for Securities and Exchange Commission as *Amicus Curiae* 10. Second, the Court accepts uncritically petitioners' and the Commission's argument that the problems with arbitration, highlighted by the *Wilko* Court, either no longer exist or are not now viewed as problems by the Court. This acceptance primarily is based upon the Court's belief in the Commission's representations that its oversight of the SROs ensures the adequacy of arbitration.

## A

I agree with the Court's observation that, in order to establish an exception to the Arbitration Act, 9 U. S. C. § 1 *et seq.*, for a class of statutory claims, there must be "an intention discernible from the text, history, or purposes of the statute." *Ante*, at 227. Where the Court first goes wrong, however, is in its failure to acknowledge that the Exchange Act, like the Securities Act, constitutes such an exception. This failure is made possible only by the unduly narrow reading of *Wilko* that ignores the Court's determination there that the Securities Act *was* an exception to the Arbitration Act. The Court's reading is particularly startling because it is in direct contradiction to the interpretation of *Wilko* given by the Court in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614 (1985), a decision on which the Court relies for its strong statement of a federal policy in favor of arbitration. But we observed in *Mitsubishi:*

> "Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to ar-

bitrate will be held unenforceable. See *Wilko* v. *Swan*, 346 U. S., at 434–435 . . . . We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. See *Wilko* v. *Swan, supra.*" *Id.*, at 627–628.

Such language clearly suggests that, in *Mitsubishi*, we viewed *Wilko* as holding that the text and legislative history of the Securities Act—not general problems with arbitration—established that the Securities Act constituted an exception to the Arbitration Act. In a surprising display of logic, the Court uses *Mitsubishi* as support for the virtues of arbitration and thus as a means for undermining *Wilko*'s holding, but fails to take into account the most pertinent language in *Mitsubishi*.

It is not necessary to rely just on the statement in *Mitsubishi* to realize that in *Wilko* the Court had before it the issue of congressional intent to exempt statutory claims from the reach of the Arbitration Act. One has only to reread the *Wilko* opinion without the constricted vision of the Court. The Court's misreading is possible because, while extolling the policies of the Arbitration Act, it is insensitive to, and disregards the policies of, the Securities Act. This Act was passed in 1933, eight years *after* the Arbitration Act of 1925, see 43 Stat. 883, and in response to the market crash of 1929. The Act was designed to remedy abuses in the securities industry, particularly fraud and misrepresentation by securities-industry personnel, that had contributed to that disastrous event. See Malcolm & Segall 730–731. It had as its main goal investor protection, which took the form of an effort to place investors on an equal footing with those in the securities industry by promoting full disclosure of information on investments. See L. Loss, Fundamentals of Securities Regulation 36 (1983).

The Court in *Wilko* recognized the policy of investor protection in the Securities Act. It was this recognition that animated its discussion of whether § 14, 48 Stat. 84, 15 U. S. C. § 77n, the nonwaiver provision of the Securities Act, applied to § 22(a), 48 Stat. 86, as amended, 15 U. S. C. § 77v(a), the provision that gave an investor a judicial forum for the resolution of securities disputes. In the Court's words, the Securities Act, "[d]esigned to protect investors, . . . requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale." 346 U. S., at 431. The Court then noted that, to promote this policy in the Act, Congress had designed an elaborate statutory structure: it gave investors a "special right" of suit under § 12(2); they could bring the suit in federal or state court pursuant to § 22(a); and, if brought in federal court, there were numerous procedural advantages, such as nationwide service of process. *Ibid.* In reasoning that a predispute agreement to arbitrate § 12(2) claims would constitute a "waiver" of a provision of the Act, *i. e.*, the right to the judicial forum embodied in § 22(a), the Court specifically referred to the policy of investor protection underlying the Act:

> "While a buyer and seller of securities, under some circumstances, may deal at arm's length on equal terms, it is clear that the Securities Act was drafted with an eye to the disadvantages under which buyers labor. Issuers of and dealers in securities have better opportunities to investigate and appraise the prospective earnings and business plans affecting securities than buyers. It is therefore reasonable for Congress to put buyers of securities covered by that Act on a different basis from other purchasers.
>
> "When the security buyer, prior to any violation of the Securities Act, waives his right to sue in courts, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts

and venue. He thus surrenders one of the advantages the Act gives him and surrenders it at a time when he is less able to judge the weight of the handicap the Securities Act places upon his adversary." *Id.*, at 435.

In the Court's view, the express language, legislative history, and purposes of the Securities Act all made predispute agreements to arbitrate § 12(2) claims unenforceable despite the presence of the Arbitration Act.[9]

---

[9] In discussing the similar nonwaiver provision under the Exchange Act, § 29(a), 48 Stat. 903, as amended, 15 U. S. C. § 78cc(a), the Court now suggests that it can be read only to mean that an investor cannot waive security-investment personnel's "compliance" with a duty under the statute. See *ante*, at 228. The Court implies that the literal language of § 29(a) does not apply to an investor's waiver of his own action. See *ibid.;* see also Brief for Petitioners 28–33; Fletcher, Privatizing Securities Disputes Through the Enforcement of Arbitration Agreements, 71 Minn. L. Rev. 393, 422–423 (1987) (Fletcher). It appears, however, that in *Wilko* the Court understood the nonwaiver provision *also* to mean that, at least in the predispute context, an investor could not waive *his* compliance with the provision for dispute resolution in the courts. This reading of the antiwaiver provision makes sense in terms of the policy of investor protection. To counteract the inherent superior position of the securities-industry professional, up to and including the time when a dispute might occur between a broker and the investor, Congress intended to place the investor on "a different basis from other purchasers." 346 U. S., at 435. Construing § 14 not to allow the investor to waive his right to a judicial forum in the predispute setting serves this congressional purpose of maintaining the investor in a special position. As one recognized commentator has noted, in the securities Acts "Congress did not take away from the citizen 'his inalienable right to make a fool of himself.' It simply attempted to prevent others from making a fool of him." L. Loss, Fundamentals of Securities Regulation 36 (1983), quoting in part 1935 Report of the (Canadian) Royal Commission on Price Spreads 38.

In *Wilko*, the Court did not discuss the situation where parties, after a dispute has arisen, enter into an agreement to arbitrate. 346 U. S., at 438 (Jackson, J., concurring). Courts have generally allowed enforcement of arbitration agreements in such circumstances despite the language of § 14, provided that the investor has made an informed waiver. See, *e. g.*, *Coenen* v. *R. W. Pressprich & Co.*, 453 F. 2d 1209, 1213 (CA2), cert. denied, 406 U. S. 949 (1972); *Moran* v. *Paine, Webber, Jackson & Curtis*, 389

Accordingly, the Court seriously errs when it states that the result in *Wilko* turned only on the perceived inadequacy of arbitration for the enforcement of § 12(2) claims. It is true that the *Wilko* Court discussed the inadequacies of this process, 346 U. S., at 435–437, and that this discussion constituted one ground for the Court's decision. The discussion, however, occurred *after* the Court had concluded that the language, legislative history, and purposes of the Securities Act mandated an exception to the Arbitration Act for these securities claims.

The Court's decision in *Scherk* is consistent with this reading of *Wilko*, despite the Court's suggestion to the contrary. See *ante*, at 229. Indeed, in reading *Scherk* as a case turning on the adequacy of arbitration, the Court completely ignores the central thrust of that decision. As the Court itself notes, *ante*, at 229, in *Scherk* the Court *assumed* that *Wilko*'s prohibition on enforcing predispute arbitration agreements ordinarily would extend to § 10(b) claims, such as those at issue in *Scherk*. The *Scherk* Court relied on a crucial difference between the international business situation presented to it and that before the Court in *Wilko*, where the laws of the United States, particularly the securities laws, clearly governed the dispute. *Scherk*, in contrast, presented

---

F. 2d 242, 245–246 (CA3 1968); see also Duke Note 558, and nn. 59, 60. This distinction makes sense when one considers that the Court's reading of § 14 to bar an investor's "waiver" of the judicial forum in the predispute setting emphasized the *moment* when this waiver occurred—"at a time when he is less able to judge the weight of the handicap the Securities Act places upon his adversary." 346 U. S., at 435. An investor would not be working under this disadvantage once a dispute has arisen. With the awareness—heightened by the reality of an actual dispute—of the possible benefits he would derive from proceeding in court and the possible burdens that his adversary would have to undergo, an investor might forgo the judicial forum for the quick resolution of the conflict in arbitration. He thus would remain master of the situation and in the special position Congress intended him to have.

a multinational conflict-of-laws puzzle.[10]  In such a situation, the Court observed, a contract provision setting forth a particular forum and the law to apply for possible disputes was "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction."  417 U. S., at 516.  Indeed, the Court thought that failure to enforce such an agreement to arbitrate in this international context would encourage companies to file suits in countries where the law was most favorable to them, which "would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements."  *Id.*, at 517.  Accordingly, the *Scherk* decision *turned* on the special nature of agreements to arbitrate in the international commercial context.[11]

---

[10] The *Scherk* Court observed:

"Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein.  The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein.  Finally, and most significantly, the subject matter of the contract concerned the sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets."  417 U. S., at 515.

[11] This reading of *Scherk* is entirely consistent with our explanation of that decision in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614 (1985), a case that also involved an agreement to arbitrate in the international business context.  There, citing *Scherk*, we concluded that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context."  473 U. S., at 629.  In discussing that case at length, we expressed our agreement with the remark in *Scherk* that such arbitration agreements constituted "'a

In light of a proper reading of *Wilko*, the pertinent question then becomes whether the language, legislative history, and purposes of the Exchange Act call for an exception to the Arbitration Act for § 10(b) claims. The Exchange Act waiver provision is virtually identical to that of the Securities Act.[12] More importantly, the same concern with investor protection that motivated the Securities Act is evident in the Exchange Act, although the latter, in contrast to the former, is aimed at trading in the secondary securities market. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 195 (1976). We have recognized that both Acts were designed with this common purpose in mind. See *id.*, at 206 ("The 1933 and 1934 Acts constitute interrelated components of the federal regulatory scheme governing transactions in securities"). Indeed, the application of both Acts to the same conduct, see Brown, Shell, & Tyson 16, suggests that they have the same basic goal. And we have approved a cumulative construction of remedies under the securities Acts to promote the maximum possible protection of investors. See *Herman & MacLean* v. *Huddleston*, 459 U. S., at 384–385.[13]

In sum, the same reasons that led the Court to find an exception to the Arbitration Act for § 12(2) claims exist for

---

specialized kind of forum-selection clause.'" 473 U. S., at 630, quoting *Scherk*, 417 U. S., at 519.

[12] Compare 15 U. S. C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void") with 15 U. S. C. § 77n ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void").

[13] Courts that initially rejected the "colorable argument" after *Scherk* and approved of the extension of *Wilko* to Exchange Act claims acknowledged the similarity between the policies of the two Acts. See, *e. g.*, *Weissbuch* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 558 F. 2d, at 835. Courts that have rejected the "colorable argument" after *Byrd* have engaged in a similar analysis. See, *e. g.*, *Wolfe* v. *E. F. Hutton & Co.*, 800 F. 2d, at 1035.

§ 10(b) claims as well. It is clear that *Wilko*, when properly read, governs the instant case and mandates that a pre-dispute arbitration agreement should not be enforced as to § 10(b) claims.

### B

Even if I were to accept the Court's narrow reading of *Wilko* as a case dealing only with the inadequacies of arbitration in 1953,[14] I do not think that this case should be resolved differently today so long as the policy of investor protection is given proper consideration in the analysis. Despite improvements in the process of arbitration and changes in the judicial attitude towards it, several aspects of arbitration that were seen by the *Wilko* court to be inimical to the policy of investor protection still remain. Moreover, I have serious reservations about the Commission's contention that its oversight of the SROs' arbitration procedures will ensure that the process is adequate to protect an investor's rights under the securities Acts.

As the Court observes, *ante*, at 231, in *Wilko* the Court was disturbed by several characteristics of arbitration that made such a process inadequate to safeguard the special position in which the Securities Act had placed the investor. The Court concluded that judicial review of the arbitrators' application of the securities laws would be difficult because arbitrators were required neither to give the reasons for their decisions nor to make a complete record of their proceedings. See 346 U. S., at 436. The Court also observed that the grounds for vacating an arbitration award were limited. The Court noted that, under the Arbitration Act, there were only

---

[14] This argument, in essence, is a functional one. It suggests that, although Congress *intended* to protect investors through the provision of a judicial forum for the enforcement of their rights under the securities Acts, this intention will not be contravened by sending these claims to arbitration because arbitration is now the "functional equivalent" of the courts. See Brief for Securities and Exchange Commission as *Amicus Curiae* 12; see also Maryland Comment 373.

four grounds for vacation of an award: fraud in procuring the award, partiality on the part of arbitrators, gross misconduct by arbitrators, and the failure of arbitrators to render a final decision. *Id.*, at 436, n. 22, quoting 9 U. S. C. § 10 (1952 ed., Supp. V). The arbitrators' interpretation of the law would be subject to judicial review only under the "manifest disregard" standard. 346 U. S., at 436.

The Court today appears to argue that the *Wilko* Court's assessment of arbitration's inadequacy is outdated, first, because arbitration has improved since 1953, and second, because the Court no longer considers the criticisms of arbitration made in *Wilko* to be valid reasons why statutory claims, such as those under § 10(b), should not be sent to arbitration.[15] It is true that arbitration procedures in the securities industry have improved since *Wilko*'s day. Of particular importance has been the development of a code of arbitration by the Commission with the assistance of representatives of the securities industry and the public. See Uniform Code of Arbitration, Exh. C, Fifth Report of the Securities Industry Conference on Arbitration 29 (Apr. 1986) (Fifth SICA Report).[16]

---

[15] The Court does not mention specifically the improvements in arbitration as a reason for abandoning *Wilko*. This reason, however, is implied in the Court's discussion of the Commission's oversight of the SROs. See *ante*, at 233–234.

[16] This Code has been used to harmonize the arbitration procedures among the SROs. See Katsoris, The Arbitration of a Public Securities Dispute, 53 Ford. L. Rev. 279, 283–284 (1984) (Katsoris). As the Commission explained: "[T]his [Code] marks a substantial improvement over the various arbitration procedures currently being utilized by the securities industry and represents an important step towards establishing a uniform system for resolving investor complaints through arbitration." SEC Exchange Act Rel. No. 16390 (Nov. 30, 1979), 44 Fed. Reg. 70616, 70617.

The rules of the Uniform Code provide for the selection of arbitrators and the manner in which the proceedings are conducted. See Fifth SICA Report; see also Code of Arbitration Procedure, CCH NASD Manual ¶¶ 3701–3744 (July 1986); Arbitration Rules 600–620, CCH American Stock Exchange Guide ¶¶ 9540–9551J (May 1986); Arbitration Rules 600–634,

Even those who favor the arbitration of securities claims do not contend, however, that arbitration has changed so significantly as to eliminate the essential characteristics noted by the *Wilko* Court. Indeed, proponents of arbitration would not see these characteristics as "problems," because, in their view, the characteristics permit the unique "streamlined" nature of the arbitral process. As at the time of *Wilko*, preparation of a record of arbitration proceedings is not invariably required today.[17] Moreover, arbitrators are not bound by precedent and are actually discouraged by their associations from giving reasons for a decision. See R. Coulson, Business Arbitration—What You Need to Know 29 (3d ed. 1986) ("Written opinions can be dangerous because they identify targets for the losing party to attack"); see also Duke Note 553; Fletcher 456–457. Judicial review is still substantially limited to the four grounds listed in § 10 of the Arbitration Act and to the concept of "manifest disregard" of the law. See, *e. g.*, *French* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F. 2d 902, 906 (CA9 1986), citing *Swift Industries, Inc.* v. *Botany Industries, Inc.*, 466 F. 2d 1125, 1131 (CA3 1972) (an arbitrator's decision must be upheld unless it is "'completely irrational'").[18]

---

CCH New York Stock Exchange Guide ¶¶ 2600–2634 (Mar. 1985). Some arbitration agreements permit arbitration before the American Arbitration Association, whose rules are similar to those in the above Codes. Brief for American Arbitration Association as *Amicus Curiae* 12–13, and App. B.; see also Fletcher 451.

[17] Under the Uniform Code of Arbitration:

"Unless requested by the arbitrators or a party or parties to a dispute, no record of an arbitration proceeding shall be kept. If a record is kept, it shall be a verbatim record. If a party or parties to a dispute elect to have the record transcribed, the cost of such transcription shall be borne by the party or parties making the request." Fifth SICA Report § 25, p. 36.

[18] The Uniform Code of Arbitration and the SRO codes modeled upon it do provide for limited discovery, see Brief for Securities Industry Association, Inc., et al. as *Amici Curiae* 9, and the ability to subpoena witnesses, see Brief for American Arbitration Association as *Amicus Curiae* 13. Yet, by arbitrating their disputes, investors lose the wide choice of

The Court's "mistrust" of arbitration may have given way recently to an acceptance of this process, not only because of the improvements in arbitration, but also because of the Court's present assumption that the distinctive features of arbitration, its more quick and economical resolution of claims, do not render it inherently inadequate for the resolution of statutory claims. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S., at 633. Such reasoning, however, should prevail only in the absence of the congressional policy that places the statutory claimant in a special position with respect to possible violators of his statutory rights. As even the most ardent supporter of arbitration would recognize, the arbitral process *at best* places the investor on an equal footing with the securities-industry personnel against whom the claims are brought.

Furthermore, there remains the danger that, *at worst*, compelling an investor to arbitrate securities claims puts him in a forum controlled by the securities industry. This result directly contradicts the goal of both securities Acts to free the investor from the control of the market professional. The Uniform Code provides some safeguards[19] but despite them, and indeed because of the background of the arbitrators, the investor has the impression, frequently justified, that his claims are being judged by a forum composed of individuals sympathetic to the securities industry and not drawn

---

venue and the extensive discovery provided by the courts. See Katsoris 287, n. 52.

[19] The Uniform Code mandates that a majority of an arbitration panel, usually composed of between three to five arbitrators, be drawn from outside the industry. Fifth SICA Report § 8(a), p. 31. Each arbitrator, moreover, is directed to disclose "any circumstances which might preclude such arbitrator from rendering an objective and impartial determination." § 11, p. 32. In addition, the parties are informed of the business associations of the arbitrators, § 9, and each party has the right to one peremptory challenge and to unlimited challenges for cause, § 10, p. 32. The arbitrators are usually individuals familiar with the federal securities laws. See *Brener* v. *Becker Paribas Inc.*, 628 F. Supp. 442, 448 (SDNY 1985).

from the public. It is generally recognized that the codes do not define who falls into the category "not from the securities industry." Brown, Shell, & Tyson 35, and n. 94; Katsoris 309–312. Accordingly, it is often possible for the "public" arbitrators to be attorneys or consultants whose clients have been exchange members or SROs. See Panel of Arbitrators 1987–1988, CCH American Stock Exchange Guide 158–160 (1987) (71 out of 116 "public" arbitrators are lawyers). The uniform opposition of investors to compelled arbitration and the overwhelming support of the securities industry for the process suggest that there must be *some* truth to the investors' belief that the securities industry has an advantage in a forum under its own control. See N. Y. Times, Mar. 29, 1987, section 3, p. 8, col. 1 (statement of Sheldon H. Elsen, Chairman, American Bar Association Task Force on Securities Arbitration: "The houses basically like the present system because they own the stacked deck").[20]

More surprising than the Court's acceptance of the present adequacy of arbitration for the resolution of securities claims is its confidence in the Commission's oversight of the arbitration procedures of the SROs to ensure this adequacy. Such confidence amounts to a wholesale acceptance of the Commission's *present* position that this oversight undermines the force of *Wilko* and that arbitration therefore should be compelled because the Commission has supervisory authority

---

[20] Commentators have argued that more public participation in the SRO arbitration procedures is needed to give investors the impression that they are not in a forum biased in favor of the securities industry. See, *e. g.*, Katsoris 313. The *amici* in support of petitioners and some commentators argue that the statistics concerning the results of arbitration show that the process is not weighted in favor of the securities industry. See Brief for Securities Industry Association, Inc., et al. as *Amici Curiae* 9; Brief for American Arbitration Association as *Amicus Curiae* 17; Fletcher 452. Such statistics, however, do not indicate the damages received by customers in relation to the damages to which they believed they were entitled. It is possible for an investor to "prevail" in arbitration while recovering a sum considerably less than the damages he actually incurred.

over the SROs' arbitration procedures. The Court, however, fails to acknowledge that, until it filed an *amicus* brief in this case, the Commission consistently took the position that § 10(b) claims, like those under § 12(2), should not be sent to arbitration, that predispute arbitration agreements, where the investor was not advised of his right to a judicial forum, were misleading, and that the very regulatory oversight upon which the Commission now relies could not alone make securities-industry arbitration adequate.[21] It is most questionable, then, whether the Commission's recently adopted position is entitled to the deference that the Court accords it.

The Court is swayed by the power given to the Commission by the 1975 amendments to the Exchange Act in order to permit the Commission to oversee the rules and procedures of the SROs, including those dealing with arbitration. See *ante*, at 233–234. Subsequent to the passage of these amendments, however, the Commission has taken the *consistent* position that predispute arbitration agreements,

---

[21] The Court accepts the argument, put forward *now* by the Commission, see Brief 18, n. 13, that its prior position was based solely on the *Wilko* decision and the decisions in the Courts of Appeals extending *Wilko* to § 10(b) claims, and not on its independent assessment of the adequacy of arbitration or its awareness of the possible abuses to which predispute agreements to arbitrate were subject. See *ante*, at 234, n. 3. Suffice it to say that the Commission's opposition to predispute agreements that might mislead an investor into giving up statutory rights even predates *Wilko*. In a release discussing proposed Rule 15c2–2, which prohibited the use of clauses purporting to bind investors to arbitrate future disputes, the Commission observed that, at least since 1951, it had opposed provisions in agreements whose result or purpose was to have investors give up rights or remedies under the securities Acts. See Disclosure Regarding Recourse to the Federal Courts Notwithstanding Arbitration Clauses in Broker-Dealer Customer Agreements, SEC Exchange Act Rel. No. 19813 (May 26, 1983), [1982–1983 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 83,356, p. 85,967, n. 6.

which did not disclose to an investor that he has a right to a judicial forum, were misleading and possibly actionable under the securities laws.[22]  The Commission remained dissatis-

---

[22] The Commission, in a release issued in 1979, explained its opposition to predispute arbitration agreements:

"It is the Commission's view that it is misleading to customers to require execution of any customer agreement which does not provide adequate disclosure about the meaning and effect of its terms, particularly any provision which might lead a customer to believe that he or she has waived prospectively rights under the federal securities laws, rules thereunder, or certain rules of any self-regulatory organization.  Customers should be made aware prior to signing an agreement containing an arbitration clause that such a prior agreement does not bar a cause of action arising under the federal securities laws.  If a broker-dealer customer's agreement contains an arbitration clause, it must be consistent with current judicial decisions regarding the application of the federal securities laws to predispute arbitration agreements.

"The Commission is especially concerned that arbitration clauses continue to be part of form agreements widely used by broker-dealers, despite the number of cases in which these clauses have been held to be unenforceable in whole or in part.  Requiring the signing of an arbitration agreement without adequate disclosure as to its meaning and effect violates standards of fair dealing with customers and constitutes conduct that is inconsistent with just and equitable principles of trade.  In addition, it may raise serious questions of compliance with the anti-fraud provisions of the federal securities laws."  Broker-Dealers Concerning Clauses in Customer Agreements Which Provide for Arbitration of Future Disputes, SEC Exchange Act Rel. No. 15984 (July 2, 1979), 44 Fed. Reg. 40462, 40464 (footnotes omitted).

As the quoted material suggests, the Commission was aware of the court cases concerning such arbitration agreements.  In the release, the Commission discussed at length this Court's *Wilko* decision and cases in which courts had extended it to § 10(b) claims.  See 44 Fed. Reg., at 40463.  The thrust of the release is that the Commission not only accepted the case law but also, for its own reasons, thought that the arbitration agreements in the predispute context were inappropriate and misleading.  See, *e. g.*, Implementation of an Investor Dispute Resolution System, SEC Exchange Act Rel. No. 13470 (Apr. 26, 1977), [1977–1978 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 81,136, p. 87,907 ("Customer agreements to arbitrate, at the instance of a firm, in margin agreements or elsewhere, should be pro-

fied with the continued use of these arbitration agreements and eventually it proposed a rule to prohibit them, explaining that such a prohibition was not inconsistent with its support of arbitration for resolving securities disputes, particularly existing ones. See Disclosure Regarding Recourse to the Federal Courts Notwithstanding Arbitration Clauses in Broker-Dealer Customer Agreements, SEC Exchange Act Rel. No. 19813 (May 26, 1983), [1982–1983 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 83,356, p. 85,967. While emphasizing the Court's *Wilko* decision as a basis for its proposed rule, the Commission noted that its proposal also was in line with its own understanding of the problems with such agreements and with the "[c]ongressional determination that public investors should also have available the special protection of the federal courts for resolution of disputes arising under the federal securities laws." *Id.*, at p. 85,968. Although the rule met with some opposition,[23] it was adopted and *remains in force today.*[24]

---

hibited"). The Commission acknowledges that in 1975 it even filed an *amicus* brief in *Ayres* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F. 2d 532 (CA3), cert. denied, 429 U. S. 1010 (1976), in which it supported the extension of *Wilko* to § 10(b) claims. See Brief 18, n. 13.

[23] The Commission rejected commentators' suggestions that the refusal to compel arbitration of securities disputes on the basis of the predispute agreements "'rests on questionable legal ground.'" See Recourse to the Courts Notwithstanding Arbitration Clauses in Broker-Dealer Customer Agreements, SEC Exchange Act Rel. No. 20397 (Nov. 18, 1983), [1983–1984 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 83,452, p. 86,357, n. 6, quoting comments of the Securities Industry Association.

[24] This rule provides in pertinent part:

"It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the Federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer." Rule 15c2-2, 17 CFR § 240.15c2-2(a) (1986).

Moreover, the Commission's own description of its enforcement capabilities contradicts its position that its general overview of SRO rules and procedures can make arbitration adequate for resolving securities claims. The Commission does not pretend that its oversight consists of anything other than a general review of SRO rules and the ability to require that an SRO adopt or delete a particular rule. It does not contend that its "sweeping authority," Brief 16, includes a review of specific arbitration proceedings. It thus neither polices nor monitors the results of these arbitrations for possible misapplications of securities laws or for indications of how investors fare in these proceedings. Given, in fact, the present constraints on the Commission's resources in this time of market expansion, see General Accounting Office, Report to the Chairman, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce: Securities Regulation—Securities and Exchange Commission Oversight of Self-Regulation 60 (1986) (Report), it is doubtful whether the Commission could undertake to conduct any such review.[25]

Finally, the Court's complacent acceptance of the Commission's oversight is alarming when almost every day brings another example of illegality on Wall Street. See, *e. g.*, N. Y. Times, Jan. 2, 1987, p. B6, col. 3. Many of the abuses re-

---

[25] Even those who would agree with the Commission that its general oversight of SRO arbitration procedures has bettered the adequacy of arbitration recognize that improvements in this oversight still are needed. For example, commentators have suggested that the Commission should revise the Uniform Code of Arbitration in order to ensure that predispute arbitration agreements are displayed prominently, that the reference to a person drawn from "outside the securities industry" be more specifically defined, and that arbitrators be required to give a more detailed statement of their reasoning. See Brown, Shell, & Tyson 34–36. Congress could give to the Commission specific rulemaking authority in the area of arbitration with the goal of preventing abuses in the process that have surfaced in recent years. *Id.*, at 34.

cently brought to light, it is true, do not deal with the question of the adequacy of SRO arbitration. They, however, do suggest that the industry's self-regulation, of which the SRO arbitration is a part, is not functioning acceptably. See Report 63. Moreover, these abuses have highlighted the difficulty experienced by the Commission, at a time of growth in the securities market and a decrease in the Commission's staff, see *id.*, at 60–61, to carry out its oversight task. Such inadequacies on the part of the Commission strike at the very heart of the reasoning of the Court, which is content to accept the soothing assurances of the Commission without examining the reality behind them. Indeed, while the *amici* cite the number of arbitrations of securities disputes as a sign of the success of this process in the industry, see Brief for Securities Industry Association, Inc., et al. as *Amici Curiae* 10–11, these statistics have a more portentous meaning. In this era of deregulation, the growth in complaints about the securities industry, many of which find their way to arbitration, parallels the increase in securities violations and suggests a market not adequately controlled by the SROs. See General Accounting Office, Report to the Chairman, Subcommittee on Oversight and Investigation of the House Committee on Energy and Commerce: Statistics on SEC's Enforcement Program 3–4 (1985). In such a time, one would expect more, not less, judicial involvement in resolution of securities disputes.

### III

There is, fortunately, a remedy for investors. In part as a result of the Commission's position in this case, Congress has begun to look into the adequacy of the self-regulatory arbitration and the Commission's oversight of the SROs. In a letter dated February 11, 1987, Representative Dingell, Chairman of the House Subcommittee on Oversight and Investigations, notified the Chairman of the Commission that the Subcommittee is "conducting an inquiry into the adequacy of the current self-regulatory system and the Commis-

sion's oversight thereof in connection with complaints against broker-dealers for securities-law violations." Letter, p. 1, enclosed with Letter from Theodore G. Eppenstein, counsel for respondents, to Joseph F. Spaniol, Jr., Clerk of this Court (Mar. 2, 1987). Representative Dingell noted that his Subcommittee was "particularly concerned about increasing numbers of complaints in connection with churning and violations of suitability requirements, as well as complaints that arbitration procedures are rife with conflicts of interest (since the arbitrators are peers of the brokerage firm being sued) and are inadequate to enforce the statutory rights of customers against broker-dealers." *Ibid.* To justify this inquiry, he cited several well-publicized examples of abuse of investors by securities-industry personnel and a General Accounting Office report on the increase in securities-law violations by brokers that went undetected by the SROs. In concluding the letter, Representative Dingell expressed his surprise at the Commission's position in the present case. In his view, that position was at odds with the one the Commission consistently had taken before the Subcommittee, which stressed the limitations on the Commission's authority over the SROs in general, and over arbitrations in particular. *Id.*, at 3. Thus, there is hope that Congress will give investors the relief that the Court denies them today.

In the meantime, the Court leaves lower courts with some authority, albeit limited, to protect investors before Congress acts. Courts should take seriously their duty to review the results of arbitration to the extent possible under the Arbitration Act. As we explained in *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" 473 U. S., at 627, quoting 9 U. S. C. § 2. Indeed, in light of today's decision compelling the enforcement of predispute arbitration agreements, it is likely

that investors will be inclined, more than ever, to bring complaints to federal courts that arbitrators were partial or acted in "manifest disregard" of the securities laws. See Brown, Shell, & Tyson 36. It is thus ironic that the Court's decision, no doubt animated by its desire to rid the federal courts of these suits, actually may *increase* litigation about arbitration.

I therefore respectfully dissent in part.

JUSTICE STEVENS, concurring in part and dissenting in part.

Gaps in the law must, of course, be filled by judicial construction. But after a statute has been construed, either by this Court or by a consistent course of decision by other federal judges and agencies, it acquires a meaning that should be as clear as if the judicial gloss had been drafted by the Congress itself. This position reflects both respect for Congress' role, see *Boys Market, Inc.* v. *Retail Clerks*, 398 U. S. 235, 257–258 (1970) (Black, J., dissenting), and the compelling need to preserve the courts' limited resources, see B. Cardozo, The Nature of the Judicial Process 149 (1921).

During the 32 years immediately following this Court's decision in *Wilko* v. *Swan*, 346 U. S. 427 (1953), each of the eight Circuits that addressed the issue concluded that the holding of *Wilko* was fully applicable to claims arising under the Securities Exchange Act of 1934.[1] See *ante*, at 248, n. 6 (opinion of BLACKMUN, J.). This longstanding interpretation[2] creates a strong presumption, in my view, that any mis-

---

[1] It was only after JUSTICE WHITE's concurrence in *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 224 (1985), indicating his "substantial doubt" about *Wilko*'s applicability to the 1934 Act, that two Circuits held it to be inapplicable. See *ante*, at 249, n. 8 (opinion of BLACKMUN, J.).

[2] Because I have never been convinced that the antifraud provisions of the federal securities laws were intended to apply to private transactions negotiated between fully informed parties of relatively equal bargaining strength, see *Landreth Timber Co.* v. *Landreth*, 471 U. S. 681, 697 (1985) (STEVENS, J., dissenting), I was not at all surprised by the Court's decision in *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974), refusing to apply the *Wilko* rule to such a case. See *Alberto-Culver Co.* v. *Scherk*, 484 F. 2d

take that the courts may have made in interpreting the statute is best remedied by the Legislative, not the Judicial, Branch. The history set forth in Part I of JUSTICE BLACKMUN's opinion adds special force to that presumption in this case.

For this reason, I respectfully dissent from the portion of the Court's judgment that holds *Wilko* inapplicable to the 1934 Act. Like JUSTICE BLACKMUN, however, I join Parts I, II, and IV of the Court's opinion.

---

611, 615–620 (CA7 1973) (Stevens, J., dissenting). As JUSTICE BLACK-MUN has demonstrated, that refusal was not predicated on any perceived difference between the 1933 Act and the 1934 Act, and it is thus fair to state that the decision the Court announces today changes a settled construction of the relevant statute.