**TRADING PLACES AERONAUTICA S.L., Plaintiff,**

v.

**RAYTHEON AIRCRAFT CORPORATION, Defendant.**

**No. 98–1356–WEB.**

United States District Court, D. Kansas.

Jan. 26, 1999.

---

Brian C. Wright, Lewis M. Reagan, Turner & Boisseau, Chartered, Great Bend, KS, for Trading Places Aeronautica S.L.

Jeff C. Spahn, Jr., Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for Raytheon Aircraft Corporation.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on defendant Raytheon's Motion to Dismiss or to Stay the Action Pending Arbitration (Doc. 4). Raytheon contends the dispute is subject to arbitration and asks that the action be stayed pursuant to 9 U.S.C. § 3.[1] Plaintiff concedes that one of its claims is subject to arbitration but argues that three others are not. The court finds that oral argument would not assist in deciding the issues presented.

1. Raytheon also filed an amended motion to stay (Doc. 7) asserting the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201, as additional authority for a stay. In view of the ruling contained herein the court finds that this additional argument is moot.

2. According to an exhibit attached to defendant's brief, on February 14, 1997, Hendry faxed Urquia back and said that, as to one potential customer named by Urquia (NAYSA), Raytheon had

### I. Facts.

Trading Places Aeronautica, S.L., does business primarily in Spain. It sells, trades, and arranges leases between operators of aircraft and aircraft companies. *Id.* at ¶ 6. Raytheon Aircraft Company, a Kansas corporation, manufactures and sells various models of aircraft.

In February of 1997, Fernando Urquia of Trading Places had correspondence or discussions with R.W. Hendry of Raytheon about brokering sales or leases of aircraft between Raytheon and certain companies in Spain. On February 10, 1997, Hendry faxed Urquia and said Raytheon would be pleased to work with Urquia on a "brokerage type arrangement subject to us not already being in contact with your prospective customers through our existing representation arrangements and subject to Raytheon approval." *Complaint* Exh. 3. Hendry requested that "in confidence" Urquia forward the names and addresses of the interested companies so he could confirm that Raytheon was not already in contact with them. *Id.* Urquia did so.[2]

In July of 1997, Raytheon Aircraft Company and Trading Places, S.L., entered into a written "International Sales Representative Agreement." *Complaint* Exh. 1 (hereinafter referred to as "the Agreement"). The Agreement appointed Trading Places as a Raytheon sales representative for Spain through the end of 1997. Raytheon promised to pay a 5% commission on Beech 1900 product sales secured by plaintiff to customers in Spain under the terms of the agreement. The Agreement indicated that the appointment was nonexclusive, meaning Raytheon had the right to appoint other sales representatives within the same area. Under the Agreement, Raytheon had the right

no known previous contacts. Hendry said Raytheon would work with Urquia on this project, and that subject to the approval of Raytheon and the conclusion of a written agreement between them the normal commission rate would be 5% of the annual lease. He further stated that through their existing Beechcraft representative (Beechcraft Espanola), Raytheon had had previous contacts with two other potential customers named by Urquia, and that Raytheon therefore wished to reserve their decision regarding how to handle these two prospects. Def.Exh. B.

to negotiate with customers the price and terms governing the sales, and its sole obligation was said to be to pay the commission in accordance with the Agreement.

The written Agreement contained the following provisions:

14.1 Any dispute, controversy or claim arising out of or in connection with this Agreement or the interpretation, validity, performance, breach or termination hereof shall be resolved by arbitration conducted at Wichita, Kansas, United States of America. The procedural rules for such arbitration shall be those of the American Arbitration Association then in effect. \*\*\*

\*   \*   \*   \*   \*   \*

14.3 The arbitration award shall be final and binding on the parties. The costs of arbitration shall be borne by the losing party or as otherwise determined by the arbitration panel. Any award of the arbitrators shall be enforceable by any court having jurisdiction over the party against which the award has been rendered, or wherever assets of the party against which the award has been rendered can be located. Representative [plaintiff] hereby irrevocably waives any claim against Raytheon for consequential, multiple, special, incidental or punitive damages. Representative agrees not to institute any legal action or proceeding against Raytheon except as provided in this Article 14 [Arbitration].

\*   \*   \*   \*   \*   \*

18.2 *Entire Agreement:* The parties intend to implement this Agreement through one or more appendices. When signed by the parties hereto said appendices shall become a part of this Agreement and shall be governed by the General Terms and Conditions hereof. Each appendix hereto and the General Terms and Conditions hereof set forth the entire understanding between the parties as to the subject matter thereof, and supersede any and all prior and/or collateral agreements relating to compensation payable to Representative in connection with any sale to any Customer of any Raytheon Aircraft Products identified in any appendix.

Count One of the complaint alleges in part: "Defendant made representations and/or promises to Plaintiff to set up a 'brokerage' relationship with Plaintiff. Specifically a commission of 5% was promised on each plane sold or leased by Plaintiff to customers in Spain. As a condition of the relationship, Defendant asked Plaintiff for names and addresses of clients, who Plaintiff had recently procured for the possible sale and/or lease of aircraft...." *Complaint* at ¶ 9. It further alleges that Raytheon was able to lease several aircraft to two customers, presumably in Spain, "who were provided to the Defendant through the diligent efforts of Plaintiff." *Id.* at ¶ 16. It states that "Defendant has failed to provide compensation commensurate with the promises and/or representations made to Plaintiff...." *Id.* at ¶ 17. Plaintiff's actions are alleged to have been taken in reliance upon the representations made by Raytheon.

Count Two alleges that plaintiff had a business relationship or expectancy with its clients, with a probability of future economic benefit, that was intentionally interfered with by Raytheon. Count Three alleges that Raytheon, with intent to deceive and with no intention of doing so, indicated a willingness to pay commissions to plaintiff, which induced plaintiff to provide Raytheon the names of customers, thereby causing plaintiff damages in the form of a lost 5% commission on aircraft sold or leased to plaintiff's clients. Count Four alleges that Raytheon breached the written agreement between the parties.

## II. *Arguments.*

Defendant argues that all of plaintiff's claims are subject to arbitration pursuant to Article 14 of the parties' written agreement. In response, plaintiff contends that Counts One, Two and Three of the complaint are independent of the written agreement and "[do] not have a sufficient nexus with the written arbitration provision for the court to order that arbitration take place." Pl.Resp. at 4. As to Count One, plaintiff contends that it provided Raytheon with the names of its clients before the contract was signed, and therefore "[a]s far as Plaintiff is concerned, the damaging actions were completed well before the existence of the written contract." *Id.* at 9–10. Similarly as to Count Three, plaintiff argues Raytheon made fraudulent representations to get the names of plaintiff's

clients and that its tortious actions and use of that information was "apart from and outside of the specific language of the contract...." *Id.* at 11. As for Count Two, plaintiff argues that the tort of interference with prospective business advantage does not fall within the language of the contract, and that it is possible for the defendant to commit this tort without breaching the contract. *Id.* Finally, plaintiff contends that section 18 of the parties' agreement relates only to prior representations concerning compensation payable and "cannot be read to include discussions, representations, or agreements concerning clients, negotiations etc." *Id.* at 13.

### III. *Federal Arbitration Act.*

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., was intended to reverse centuries of judicial hostility to arbitration agreements. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). It did so by placing arbitration agreements on the same footing as other contracts. *Id.* at 225–26, 107 S.Ct. 2332. To this end, the Act provides that certain arbitration agreements [3] "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement. *Shearson,* 482 U.S. at 226, 107 S.Ct. 2332 (*citing* 9 U.S.C. § 3).

### IV. *Discussion.*

█ The first matter to be addressed when a dispute as to arbitrability arises is whether the court or the arbitrator is to decide which claims are arbitrable. The parties appear to agree that the court should determine which claims are arbitrable in this case. This is consistent with the rule that "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so," *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985, 994 (1995), because there is no indication of such an intent in the parties' Agreement.

█ Plaintiff does not argue that the arbitration clause is invalid or unenforceable. Pl. Resp. at 4. Rather, plaintiff believes three of its claims fall outside the scope of the arbitration clause. In making this argument, it asserts that ambiguity in the language referring "any dispute ... or claim arising out of or in connection with this Agreement" must be construed against the defendant as the drafter of the agreement. Pl.Resp. at 6–8. This latter contention overlooks the federal policy favoring arbitration and the Federal Arbitration Act, which "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Thus, a contract with a broad arbitration clause gives rise to a presumption of arbitrability which is overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1462 (10th Cir.1995).

█ With the foregoing standard in mind, and under the terms of the parties' agreement, the court concludes that the claims asserted by plaintiff fall within the scope of the agreement to arbitrate. Plaintiff agreed to arbitrate "[a]ny dispute, controversy or claim arising out of or in connection with" the parties' Agreement. This broad language creates a presumption of arbitrability of any claims connected with the Agreement. All of the counts in the complaint are connected with the rights and obligations in the parties' Agreement. Although plaintiff argues Count One is based on representations made before the written agreement was signed, that allegation is insufficient to take the claim outside the arbitration clause. The alleged representations were made by Raytheon as a condition to entering the agreement. *Complaint,* Exh. 3. They were indisputably made in the

---

**3.** The Act's coverage includes written provisions in "a contract evidencing a transaction involving commerce...." 9 U.S.C. § 2. There is no dispute that the Act covers the contract at issue in this case.

**1312**

course of the parties' negotiations and culminated in the written Agreement. Section 18.2 of the Agreement provides that the Agreement and appendices "set forth the entire understanding between the parties as to the subject matter thereof, and supersede any and all prior or collateral agreements and representations relating to compensation payable to Representative in connection with any sale to any Customer of any Raytheon Aircraft Products identified in any appendix. . . ." Despite plaintiff's assertion to the contrary, Count One concerns such prior representations; it alleges that Raytheon leased aircraft to Spanish customers and then "failed to provide compensation commensurate with the promises and/or representations made to Plaintiff. . . ." *Complaint* at ¶ 17. Count Three bears a similar connection to the Agreement; it alleges that Raytheon did not intend to perform its promises with respect to dealings with the Spanish customers and that "Plaintiff sustained damages in the form of a lost 5% commission. . . ." *Id.* at ¶ 28. Finally, Count Two alleges that Raytheon interfered with plaintiff's future economic expectancy by "conduct[ing] business directly with Plaintiff's clients without informing Plaintiff. . . ." *Complaint* at ¶ 22. This too bears an obvious connection with the Agreement, under which Raytheon had "the right to establish and negotiate with the Customers the prices, terms and conditions governing the sale of the Raytheon Aircraft Products" and its sole obligation was "to pay the Commission in accordance with the provisions hereof." *Complaint,* Exh. 1, Art. 12.1 & 12.2. If these connections to the Agreement were not sufficient, any remaining doubt about plaintiff's right to sue on these claims is disposed of by Section 14.3 of the Agreement: "[Plaintiff] agrees not to institute any legal action or proceeding against Raytheon except as provided in this Article 14 [on Arbitration]."

In sum, all of the claims are "arising out of or in connection with" the parties' Agreement. Obviously, plaintiff believes the sales made by Raytheon to Spanish customers were secured by its efforts and that a commission is due for such sales. The parties set forth their agreement on the circumstances under which a commission would be due the plaintiff. Whether or not Raytheon breached any obligation it assumed in the agreement—including the obligation of good faith implied in all such agreements—is a matter the parties agreed to submit to arbitration.

### V. Conclusion.

Defendant Raytheon's Motion to Stay (Doc. 4) is GRANTED. The court hereby orders that the action be stayed while the parties proceed to arbitration in accordance with their agreement. IT IS SO ORDERED this 26th day of January, 1999, at Wichita, Ks.