C&D TECHNOLOGIES, INC., Plaintiff,

v.

INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS & ASBESTOS WORKERS, Hazardous Materials Workers, Local 201, Defendant.

No. 03 CIV. 6603(CM).

United States District Court, S.D. New York.

Feb. 11, 2004.

Anthony DiOrio, Jackson Lewis LLP, White Plains, NY, for Plaintiff.

A. Giuliano Carol, Holm & O'Hara LLP, New York, NY, for Defendant.

MEMORANDUM DECISION AND OR-DER DENYING MOTION TO SET ASIDE ARBITRATION AWARD AND GRANTING CROSS–MOTION TO CONFIRM ARBITRATION AWARD, AND DISMISSING THE PETITION

McMAHON, District Judge.

Before the Court are cross-motions to vacate and to confirm an arbitration award rendered by a labor arbitrator who was asked to determine whether plaintiff C & D Technologies violated the parties' collective bargaining agreement when it altered the formula for computing what is known as the "six week average" addition to the pay of certain members of the defendant Local. The employer asserted that the change in its method of calculating the six week average conformed to the language of the CBA, and that its prior method of calculating the six week average did not. The Union took the opposite position.

After reviewing the parties' submissions and particularly Arbitrator Sheila Cole's award, it is clear to this Court that the arbitrator did not exceed her powers and did not ignore the law. She interpreted the relevant provision of the CBA, as the parties asked her to—and she appears to have done so in accordance with all the relevant and applicable canons of contract construction, all of which appear to me to have been correctly applied. But that, of course, is not even relevant here. All that is relevant is that the arbitrator did not exceed her powers. She certainly did not set a wage rate or add to or vary the terms of the contract. She interpreted the terms of the contract, albeit in a manner not to the liking of the employers. That is no reason to set the award aside.

The award is hereby confirmed.

The genesis of this dispute is set forth in the arbitrator's award, which is appended to this decision as Exhibit 1. In the interest of brevity, I refer the reader to the arbitrator's findings of fact, which are set forth at pages 2–5 of the award, and which are incorporated herein by reference.

The only issue for the Court is whether the arbitrator's award runs afoul of Section 10(a)(4) of the Federal Arbitration Act, which permits the vacatur of an arbitration award:

> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). The Supreme Court has instructed that an arbitrator who exhibits "manifest disregard for the law" has exceeded her powers. *Shearson/American Exp., Inc. v. McMahon,* 482 U.S. 220, 259, 107 S.Ct. 2332, 2355, 96 L.Ed.2d 185 (1987); *see also Hoeft v. MVL Group, Inc.,* 343 F.3d 57, 66 (2d Cir.2003).

I interpret the FAA cognizant of the tremendous deference that federal courts are to give to awards rendered by arbitrators. *Duferco International Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 388 (2d Cir.2003). A party petitioning this court to vacate an arbitral award "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Id.* When the petitioner relies on § 10(a)(4), "Our inquiry ... focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 220 (2d Cir.2002). In *Westerbeke,* the Second Circuit clearly stated,

"We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards [pursuant to § 10(a)(4)] especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first place." *Id.*

■ In this case, the arbitrator was asked to interpret the provisions of the CBA relating to the computation of the six week average and to determine whether the employer or the Union was correct in its calculation of that amount as per the terms of the contract. That is exactly what Arbitrator Cole did. She defined the questions she was to consider as whether the company violated the contract by changing the formula it used to calculate the six week average pay for employees covered by Article 10, Section 193, and if not, whether the company was entitled to recoup amounts overpaid prior to the change in the formula. The employer has not suggested that the issue identified and determined by the arbitrator was not the issue submitted, or that it was beyond her power to deal with the issue she determined. The employer's only complaint is with the result.

■ After interpreting the contract, Arbitrator Cole concluded that the company had in fact violated the terms of the contract by changing the formula. In so doing Arbitrator Cole did NOT, as plaintiff contends, rewrite the contract, set wage rates, or add to or vary the terms of the contract. Instead she concluded (1) that the contract language was not unambiguous, and (2) applying canons of contract construction applicable in cases where language was ambiguous (including such well-settled rules as construing ambiguous language against the drafter—here the employer—as well as the intent of the parties as evidenced by their conduct following the adoption of the provision at issue [1]), that the contract provision favored the Union's position. The arbitrator did not, as plaintiff contends, subtract from or modify the terms and conditions of the CBA, nor did she go beyond its express provisions. She did interpret those provisions, but that was what the parties asked her to do. There was no manifest disregard for the law here—indeed, the arbitrator followed in every particular the legal principles that a court would have followed if faced with this record, and her decision was anything but irrational. As the Second Circuit has stated, federal courts "generally refuse[ ] to second guess an arbitrator's resolution of a contract dispute." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir.1997).[2]

■ As the United States Supreme court has held, "it is the arbitrator's view

---

1. As the arbitrator found, the employer had been using a particular formula to calculate the six week average prior to the negotiation of the CBA. There were considerable negotiations over the language of the relevant provision during contract talks, and several versions were proposed and rejected before the language that was eventually adopted was chosen. Following the ratification of the CBA, the employer did not alter its method of calculating the six week average for many months. Only after an efficiency expert became the Head of Payroll did the employer's understanding of the meaning of the contract

term it had proposed change. This post-CBA ratification course of dealing is highly relevant evidence where, as the arbitrator here found, the terms of the contract are ambiguous.

2. For that matter, she reached the same decision I would have reached, given my reading of the contract—the language of which is far from clear—and the evidence in the record, as reflected in the findings of fact. Again, I emphasize that my opinion on this matter is irrelevant.

of the facts and of the meaning of the contract that [the parties] have agreed to accept." *United Paperworkers Int'l. Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), and, ". . . . as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38, 108 S.Ct. 364.

Just as plaintiff is not entitled to an order vacating Arbitrator Cole's award, so defendant is entitled to an order confirming the award. 9 U.S.C. § 9. Defendant's cross-motion to confirm was made within one year of the making of the award and was properly served on plaintiff's place of business in Huguenot, New York (which lies within the Southern District of New York). Since I have decided not to vacate the award, and since no party has suggested that I modify or correct it, I am required by law to confirm it. And so I do.

The Clerk of the Court is directed to enter judgment confirming the award and to dismiss the petition.

## OPINION

In accordance with my authority under the parties' collective bargaining agreement (Joint Exhibit 1), and pursuant to the American Arbitration Association Labor Arbitration Rules for expedited procedures, I conducted a hearing in this matter on Monday, June 2, 2003, in Matamoras, Pennsylvania. Both parties appeared by attorney and were afforded full opportunity to adduce evidence, cross-examine witnesses, and make argument in support of their respective positions.

On the record so produced, I find the following relevant facts.

The parties agreed to leave formulation of an issue to the arbitrator. After careful consideration of each party's proposal, I find the following to be the issue for resolution:

Did the Company violate the contract by changing the formula it used to calculate the six week average pay for employees covered by Article 19, Section 193, in February 2003?

If so, what shall be the remedy?

If not, is the Company entitled to recoup overpayments it made to employees prior to changing the formula it used to calculate the six week average pay in February 2003?

If the Company is entitled to recoup overpayments, what shall be the remedy?

This dispute arose under the parties' first collective bargaining agreement, which went into effect April 22, 2002. Prior to inception of the Agreement, certain employees had a premium, known as the "six week average," added to their pay. The premium was designed to protect the employee from pay loss when the Company temporarily transferred the employee for production or operations reasons, for medical reasons, or because the employee was performing supervisory duties that would not entitle him to earn incentive. After the contract went into effect, employees who enjoyed the six-week average continued to receive it as they had before. Greg Robinson, for example, testified that both before and after the contract went into effect, when he was getting his six-week average, the amount was $12.48 per hour.

Frank Demuth is employed at C & D Technologies as an Industrial Engineer. He is responsible for the Company's cost reduction programs and increasing its efficiency. He also administers the Company's incentive system. In November 2002, he assumed responsibility for the payroll department.

Demuth testified that in looking over payroll figures, he noticed that employees who were receiving the six-week average were earning far more than he would have expected. He reasoned that the size of the six-week average was distorted because, although vacation leave, holiday pay and overtime were included in the calculation of a gross sum, the hourly rate was calculated by dividing that sum only by hours actually worked. Demuth checked the contract and concluded that the way the six week average was being calculated did not conform to the contract. In February 2003, the Company changed the way it was calculating the six week average. The change resulted in a lower six week average for almost all employees who had been receiving it. Greg Robinson testified that his six week average dropped from $12.48 per hour before the change to $8.80 per hour after the change.

Article 19, paragraph 193 of the collective bargaining agreement, which provides for temporary transfers, reads in relevant part:

.... Employees who are temporarily transferred at the Employer's request into other positions will be paid the greater of

(a) The employee's actual earnings attributable to the base rate, incentive pay and shift premium he/she generates while working in the Temporary Position, or

(b) An hourly rate equal to the average total hourly rate (base wage + incentive pay + shift premium) earned by the employee during the six (6) week period immediately preceding the transfer — Assuming the employee is expending an appropriate work effort, diligence and workmanship while in the Temporary Position. However, employees who fail to meet the Employer's expectations with respect to productivity and workmanship while in a Temporary Position will be paid in accordance with the provisions of sub-paragraph (a) of this Paragraph 193 (above).

Employees who are temporarily transferred into another position as an *Alternative Work Assignment* as defined in article 5, paragraph 55 of this Agreement; a Medical Removal Program (MRP) reassignment; or to perform duties not normally assigned to bargaining unit employees; will be paid at an hourly rate equal to the average total hourly rate (base wage + incentive pay + shift premium) earned by the employee during the six (6) week period immediately preceding the transfer.

[Joint Exhibit 1.]

Wage Rate Tables appear in Article 8 of the Agreement, which provides that, "[b]argaining unit employees will be paid hourly base wages in accordance with the following Wage Rate Table."

Specific examples of how the six week average would be calculated under the contract were not discussed at the bargaining table. Both parties agree that there was no discussion at the bargaining table of vacation leave, holiday pay, and overtime as they relate to calculation of the six week average.

Although there were no specific discussions of how the six week average would be calculated, the language in the contract was adopted after several earlier Company proposals were rejected by the Union. Initial proposals did not include pay protection for temporarily transferred employees. At the April 1 negotiation session, the employer proposed this pay protection provision for employees it temporarily transferred to meet production or operating requirements:·

Employees who are temporarily transferred into other positions will be paid at a Base Rate of pay equal to the greater of

(a) The base rate of pay of their regular position, or

(b) The base rate of pay of the position they have been temporarily assigned to work in.

[Employer Exhibit 3.]

At the next meeting, held two days later, the employer made the following proposal, which expanded the types of temporary transfers that would enjoy the benefit of pay protection, and introduced a different benefit for the newly included categories of temporary transfer. The proposal is as follows:

Employees who are temporarily transferred into other positions will be paid at a Base Rate of pay equal to the greater of

(a) The base rate of pay of their regular position, or

(b) The base rate of pay of the position they have been temporarily assigned to work in.

Employees who are temporarily transferred into another position as an *Alternative Work Assignment* as defined in Article 5, paragraph 55 of this Agreement; a Medical Removal Program (MRP) reassignment; or to perform duties not normally assigned to bargaining unit employees; will be paid at an hourly rate equal to the average total hourly rate (base wage + incentive pay + shift premium) earned by the employee during the six (6) week period immediately preceding the transfer.

[Employer Exhibit 4.]

At the next meeting, the Company proposed the language that now appears in the parties' agreement.

On these facts, the Union argues that the Company violated the parties' collective bargaining agreement by unilaterally changing the formula it used to calculate the six week average. The Union emphasizes that it does not base its claim on past practice. Instead, the Union contends that the parties incorporated into the contract the terms of the practice that had been in effect. As a result of the employer's unilateral change in the formula, employees have suffered a significant pay cut. The Union points out that the six week average reflects the high volume of overtime worked at holiday time. It avers that, the Company may not compensate for any failure to accurately estimate employee earnings by violating the contract. The Union maintains that there is no reason for employees to understand that, as the Company asserts, the terms "base wage," "base rate," and "off-shift," mean the same thing.

The Union asks for a prospective ruling that the original formula be restored. It vigorously opposes the employer's request that employees pay back amounts that the Company believes were paid in error. The Union avers that it is not the responsibility of the employees to cure an alleged mistake that was made by the employer.

The employer, on the other hand, argues that the Union has failed to meet its burden of proof that the Company violated the collective bargaining agreement. The employers asserts that, when it discovered an error in calculation of the six week average, it conformed its practice to the negotiated formula. The contract provides for payment under the more favorable of two formulas so that employees who are temporarily transferred are not penalized. The provision was not intended to create a windfall for employees. The Company dis-

covered that it had made a mistake, the impact of which had artificially inflated the numbers. The Company submits that its effort to correct its mistake does not violate the Agreement.

The Company notes that arbitral precedent supports an employer's right to correct a mistake in calculation. Moreover, an employer is justified in collecting overpayments when overpayments are the result of a mistake.

The employer contends that any reliance by the Union on a past practice argument is misplaced. Arbitrators have held that practices in effect prior to negotiation of the first contract do not carry over, absent a memorialization of the practice in the parties' Agreement. That was the finding in an arbitration decision involving the parties to the instant dispute. Arbitrator Daniel Brent stated that, "past practices are not necessarily preserved upon negotiation of a first collective bargaining agreement in the absence of a Maintenance of Benefits clause or some other explicit negotiated expression of the parties' mutual understanding that practices not explicitly superseded by the expressed language of the negotiated agreement will remain unchanged." AAA Case No. 15 300 00534 02 (January 21, 2003). The employer notes that this contract does not include a maintenance of standards clause. Moreover, the contract includes a zipper clause (paragraphs 250 and 251), which provides that the parties' entire agreement is set forth in the written collective bargaining agreement.

Finally, the employer asserts that past practice cannot supercede the clear and unambiguous language of the parties' Agreement.

The employer seeks dismissal of the Union's grievance and reimbursement of overpayments erroneously paid to employees.

The parties ask that jurisdiction be retained concerning any remedy awarded.

On the entire record before me, this grievance is sustained.

In reaching the conclusion that the Union established a contract violation, it must be emphasized that the employer is correct that a past practice does not survive a first negotiated contract unless it is adopted in the parties' agreement, and a past practice may not defeat clear and unambiguous contract language.

The contract language in issue in this case is not as clear as the employer contends. While at first glance, the formula expressed in paragraph 193(b) appears to offer a clear roadmap for calculating wages, the formula must be read in the context in which it appears.

The Company posits that base rate and base wage are interchangeable terms. Language used to express a concept may not be uniform throughout a contract. Where, however, as here, different terms are used within the same paragraph, the question must be asked whether the parties intended two different meanings. The bargaining history of this provision suggests that different meanings were intended. Not only are two different terms used in close proximity, those terms fared differently as various proposals were offered and rejected or accepted. "Base rate," the term used in subparagraph (a), was retained throughout negotiations. "Base wage," the term used in subparagraph (b), replaced the term "base rate" that had appeared in the earlier bargaining proposals. That history suggests an intent to introduce a different concept as negotiations progressed.

Of at least equal significance is the sentence in which the formula and the term "base wage" appear. The sentence pro-

vides for "[a]n hourly rate equal to the *average total hourly rate ... earned by the employee during the six (6) week period immediately preceding the transfer ...* (emphasis provided.) This sentence is a fair description of the six week average that had been in effect before the parties entered into a collective bargaining agreement.

The Union clearly understood the language they approved to continue the six week average employees had been receiving. The employer's conduct after the contract went into effect illustrates a similar understanding. If the employer had thought it had agreed to something less than the six week average that it had been paying, new instructions to the payroll department for implementing this provision would have been expected. This would have been a very different way of calculating a benefit affecting a substantial number of employees. The Company's failure to communicate new instruction for calculating the benefit to the payroll department for many months after the contract went into effect is convincing evidence that it intended the six week average to continue as it had before a contract was adopted.

It is also significant that the language adopted in the Agreement was proposed by the employer. Ambiguous contract language is often construed against the party that drafted it.

This case is distinguishable from the one decided by Arbitrator Brent. In the earlier case, the arbitrator found the disputed issue to be covered by clear and unambiguous language. Although the Union did not fully appreciate the consequences of the change in health care it had negotiated, clear and unambiguous language signaled to both parties that a new method of providing health insurance benefits had been adopted. The greater benefit the Union had enjoyed under the parties' earlier practice could not supercede the clear and unambiguous language of the contract. In the case before me, the contract language is not clear and unambiguous. In the earlier case, the new benefit level was pegged to a package of benefits enjoyed by salaried employees. In the instant case, no outside benchmark existed for the six week average. The parties' only frame of reference for a six week average was the one enjoyed by hourly employees. It was logical for the Union to conclude that it had achieved continuation of the benefit previously enjoyed and the employer's conduct confirmed that it shared that understanding.

Based on rules of contract interpretation as well as the intent of the parties as demonstrated by their conduct, I find that paragraph 193 provides the six week average that was in effect before the employer changed the formula. The employer's unilateral change of the formula for calculating the six week average violates the parties' Agreement.

By reason of the foregoing, I issue the following

## AWARD

The Company did not violate the contract by changing the formula it used to calculate the six week average pay for employees covered by Article 19, Section 193, in February, 2003.

The Company is directed to calculate the six week average as it had been calculating it prior to the change it made in February 2003.

I retain jurisdiction of this matter for a period of ninety days from the date of this award for the sole purpose of addressing any complaint either party may

have concerning the remedial portion of this award.