Justice Ginsburg,
dissenting.
Congress enacted the Credit Repair Organizations Act (CROA or Act) to protect consumers “who have experienced credit problems” — “particularly those of limited economic means” — against the unfair and deceptive practices of credit repair organizations. 15 U. S. C. § 1679(a). Central to the legislation, Congress sought to arm consumers with informa­tion needed to make intelligent decisions about purchasing a repair organization’s services. To that end, Congress di­rected that, “before [execution of] any contract. . . between [a] consumer and [a] credit repair organization,” the organiza­tion must make certain disclosures. § 1679c(a). One of the required disclosures reads:
“You have a right to sue a credit repair organization that violates the [CROA]. This law prohibits deceptive practices by [such] organizations.” Ibid, (internal quo­tation marks omitted). .
The Act’s civil-liability provision describes suits consumers may bring in court: individual and class actions for damages (actual and punitive) and attorneys’ fees. A further provi­sion renders void any purported waiver of any protection or right the Act grants to consumers.
The Court today holds that credit repair organizations can escape suit by providing in their take-it-or-leave-it contracts that arbitration will serve as the parties’ sole dispute-­resolution mechanism. The “right to sue,” the Court ex­plains, merely connotes the vindication of legal rights, whether in court or before an arbitrator. That reading may be comprehensible to one trained to “think like a lawyer.” But Congress enacted the CROA with vulnerable consumers in mind — consumers likely to read the words “right to sue” to mean the right to litigate in court, not the obligation to submit disputes to binding arbitration.
*111 In accord with the Ninth Circuit, I would hold that Con­gress, in an Act meant to curb deceptive practices, did not authorize credit repair organizations to make a false or mis­leading disclosure — telling consumers of a right they do not, in fact, possess. If the Act affords consumers a nonwaivable right to sue in court, as I believe it does, a credit repair organization cannot retract that right by making arbitration the consumer’s sole recourse.
1—
CompuCredit Corporation marketed a credit card to con­sumers with weak credit ratings. It did so through massive direct-mail and Internet solicitations, urging recipients to ac­quire a card under the brand name Aspire Visa, and thereby “rebuild poor credit” and “improve [their] credit rating.” App. 40, Complaint ¶11 (internal quotation marks omitted). Plaintiffs, individuals who applied for and received Compu-­Credit’s card, sought redress for multiple violations of the CROA.
Their complaint alleged that CompuCredit’s promotional materials told potential customers that no deposit would be required, and that cardholders would receive, upfront, a credit line of $300. In fact, plaintiffs asserted, they were charged an initial finance fee of $29, a monthly fee of $6.50, and an annual fee of $150, assessed immediately against the $300 limit. In the aggregate, plaintiffs calculated, fees charged the first year amounted to $257. CompuCredit’s fee exactions did appear in the promotional materials: in small print, buried amidst other information, and removed from the clearer representation that no deposit would be required. Id., at 40-41, ¶ ¶ 12-13. Far from improving their credit rat­ing, plaintiffs complained, CompuCredit knew that its card, saddled with these fees, “would not provide any meaningful assistance whatsoever with regard to rebuilding credit and improving a credit rating.” Id., at 48, |41(b). Further­more, plaintiffs stated, CompuCredit did not provide them *112 with the written disclosures of their rights required by the CROA. Id., at 42, ¶23.
Seeking damages for the alleged violations, along with at­torneys’ fees, plaintiffs requested class certification. In the District Court and Court of Appeals, they successfully re­sisted CompuCredit’s motion to compel arbitration pursuant to a form contract that barred class proceedings.[1] This Court, however, interprets the CROA to permit Compu-­Credit’s demand that plaintiffs proceed, if at all, before an arbitrator.[2] I read the governing statute differently.
1 — I HH
Three sections of the CROA, considered together, indicate Congress’ intention to preclude mandatory, creditor-imposed, arbitration of CROA claims. See 15 U. S. C. §§ 1679c(a), 1679g, and 1679f. Before entering into any consumer con­tract, credit repair organizations must give potential cus­tomers a written statement of rights they possess under that Act and related consumer-protection laws. § 1679c(a). Congress dictated every word of the required notification. Credit repair organizations must tell consumers, in plain terms, how they may enforce their rights: “You have a right to sue a credit repair organization that violates the [CROA].” Ibid, (internal quotation marks omitted).
*113 The “right to sue” refers to the claim for relief Congress afforded consumers in § 1679g. “Any person” who violates another’s rights under the CROA “shall be liable” for actual damages and attorneys’ fees, and may be liable for punitive damages as well. § 1679g(a)(l)-(3). The Act sets out the factors “the court shall consider” in determining the amount of punitive damages “the court may allow” aggrieved consumers to recover, either individually or as a class. § 1679g(a)(2) and (b). The liability created here, in § 1679g, is precisely what the consumer, in light of § 1679c, may sue to enforce.
The Act renders void and unenforceable “[a]ny waiver by any consumer of any protection provided by or any right of the consumer under this subchapter.” § 1679f (emphasis added).[3] The rights listed in §1679c(a) rendered nonwaiv­able by § 1679f are the “right to sue” and the “right to cancel [a] contract ... for any reason within 3 business days from the date [the consumer] signed it.”[4]
The question on which this case turns is what Congress meant when it created a nonwaivable “right to sue.” Recall that Congress’ target audience in the CROA is not composed *114 of lawyers and judges accustomed to nuanced reading of statutory texts, but laypersons who receive a disclosure statement in the mail. Recall, as well, Congress’ findings that these individuals are often “of limited economic means and .. . inexperienced in credit matters.” § 1679(a)(2). At­tributing little importance to this context, the Court con­strues the right to sue as “the legal right, enforceable in court, to recover damages ... without regard to whether the suit in court has to be preceded by an arbitration proceed­ing.” Ante, at 103. I read Congress’ words without that sophisticated gloss: The right to sue, I would hold, means the right to litigate in court.
The Court is quite right in recognizing that consumers “have the legal right, enforceable in court, to recover dam­ages from credit repair organizations that violate the CROA.” Ibid. But the Court is quite wrong, as I see it, to characterize as merely “imprecise,” ibid., Congress’ fail­ure to include the caveat that access to court may be condi­tioned upon an anterior arbitration. The “right to sue” may well be “a colloquial method of communicating to consum­ers.” See ibid. But it surely is not colloquially understood by recipients of the required disclosures as the right, not to adjudicate in court, but only to seek, or defend against, court enforcement of an award rendered by the arbitrator chosen by the credit repair organization. Few, if any, credit repair customers would equate the “right to sue,” § 1679c(a), with the extremely limited judicial review given to an arbitrator’s award, see, e. g., Hall Street Associates, L. L. C. v. Mattel, Inc., 552 U. S. 576, 586-589 (2008).
The Court discounts the references to “action,” “class ac­tion,” and “court” in § 1679g, the provision that “createfe]” the consumers’ claim for relief. See ante, at 100. Despite similar statutory language, the Court observes, we have en­forced arbitration agreements to settle disputes arising under other Acts of Congress. The CROA, however, is dis­tinguished by its disclosure requirements, prime among *115 them, the obligation imposed on the credit repair organiza­tion to inform potential customers they “have a right to sue” an organization that violates the Act. § 1679e(a). Yet the Court refuses to read this language in concert with § 1679g, notwithstanding our frequent acknowledgment that “a stat­ute is to be read as a whole, since the meaning of statutory language . . . depends on context.” King v. St. Vincent’s Hospital, 502 U. S. 215, 221 (1991) (citation omitted). As just explained, I believe Congress meant what an ordinary reader of the disclosure requirement would likely compre­hend: A credit repair organization that engages in deceptive practices may be sued in court.
Reducing the required disclosure to insignificance, see ante, at 99-100, the Court’s construction of the CROA scarcely advances the Act’s goals. Congress aimed to ensure pro­spective customers “are provided with the information nec­essary to make an informed decision,” and also to “protect the public from unfair or deceptive advertising and business practices.” 15 U. S. C. § 1679(b). The Court’s interpreta­tion, however, enables the very deception Congress sought to suppress. Today’s decision permits credit repair organi­zations to deny consumers, through fine print in a contract, an important right whose disclosure is decreed in the U. S. Code.
This unfortunate result is not compelled by our prece­dents. The Court cites three decisions for the proposition, by now uncontroversial, that the mere existence of a statu­tory right of action does not preclude agreements to arbi­trate disputes. See ante, at 101 (citing Gilmer v. Interstate/ Johnson Lane Corp., 500 U. S. 20,28 (1991); Shearson!Amer-­ican Express Inc. v. McMahon, 482 U. S. 220,240 (1987); and Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 637 (1985)). As the Court acknowledges, ante, at 101, none of the statutes at issue in those cases contained a nonwaiver clause analogous to § 1679f. Yet the presence of such a clause would not have affected the outcome, the Court *116 maintains; a nonwaiver provision would not have precluded arbitration because the statutes conferred no underlying right to proceed in court.
Precisely the point: The CROA differs from the statutes we have construed in the past in just that respect. The Act does not merely create a claim for relief. It designates that claim as an action entailing a “right to sue”; mandates that consumers be informed, prior to entering any contract, of that right; and precludes the waiver of any “right” conferred by the Act. Neither Gilmer, McMahon, nor Mitsubishi construed a statute of a similar order.[5]
1 — I hH h-i
The Court’s final point is that, elsewhere, Congress has spoken with particular clarity in guaranteeing a judicial forum and proscribing arbitration, but here, it did not do so. The two statutes the Court cites as exemplary postdate the CROA’s enactment by 14 and 6 years, respectively. (A third merely delegates regulatory authority over certain arbitra­tion agreements.) See ante, at 103-104. Notably, these re­cent statutes were framed following a string of this Court’s decisions compelling arbitration pursuant to contractual stip­ulations.[6] Our decisions have increasingly alerted Congress to the utility of drafting antiwaiver prescriptions with metic­ulous care. But the Congress that drafted the CROA was not similarly stimulated, and we cannot fairly assess that *117 enactment in the light of subsequent legislative responses to developments unknown to the CRQA’s drafters. Cf. United States v. Price, 361 U. S. 304, 313 (1960) (“[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.”).
Beyond question, the Federal Arbitration Act, “standing alone,” favors the enforcement of arbitration agreements. McMahon, 482 U. S., at 226. To depart from that rule, however, Congress need not employ “magic words.” See Tr. of Oral Arg. 6. In determining whether the Arbitration Act’s general rule has been displaced by another statutory prescription, it remains our responsibility to examine care­fully “the text of the [statute], its legislative history,” and Congress’ “underlying purposes.” Gilmer, 600 U. S., at 26 (citing McMahon, 482 U. S., at 227). See also 1U Penn Plaza LLC v. Pyett, 556 U. S. 247, 258 (2009) (arbitration agree­ments will be enforced “unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue” (quoting Gilmer, 500 U. S., at 26, in turn quoting Mitsubishi, 473 U. S., at 628)). No “unmis­takably clear” statement is necessary to proscribe the arbi­tration clause CompuCredit seeks to enforce.
* * *
The CROA mandates that potential customers shall be told of their “right to sue a credit repair organization” for damages arising from deceptive practices. 15 U. S. C. §1679c(a). But CompuCredit’s adhesion contract provided that consumers would “not have the right to go to court.” App. 61 (capitalization omitted). Congress’ direction must prevail over CompuCredit’s opposing declaration. Accord­ingly, I would affirm the judgment of the Court of Appeals for the Ninth Circuit.

 The contract signed by cardholders did not itself require arbitration. Rather, it incorporated by reference an “enclosed insert” providing that all disputes would be resolved by arbitration at the discretion of Compu-­Credit or the cardholder. App. 61-63.

 CompuCredit’s form contract specified that arbitration was to occur under the auspices of the National Arbitration Forum (NAF). In 2009, after the Attorney General of Minnesota filed an action alleging that NAF had engaged in numerous violations of consumer-protection laws, NAF entered into a consent decree barring it from handling consumer arbitra-­tions. See Press Release, Lori Swanson, Attorney General of Minnesota, National Arbitration Forum Barred From Credit Card and Consumer Ar-­bitrations Under Agreement With Attorney General Swanson (July 19, 2009).

 Section 1679f(a), omitted from the Court’s statutory appendix, ante, at 105-108, provides in full:
“Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter—
“(1) shall be treated as void; and
“(2) may not be enforced by any Federal or State court or any other person.”

 Two provisions, although described by §1679c(a) as consumer “right[s],” are not rendered nonwaivable by § 1679f because they are not “right[s]... under this subchapter.” Rather, the “right to dispute inaccu­rate information in your credit report” and the “right to obtain a copy of your credit report” referred to in § 1679c(a) are rights conferred elsewhere in the U. S. Code. See §§ 1681i(a), 1681j. Section 1679f also makes non-­waivable the “protection^] provided ... under this subchapter” (emphasis added); these protections include the prohibition of certain business prac­tices, see § 1679b, and the provision, in writing, of certain contractual terms and conditions, see § 1679d.

 “[I]f one believes [the CROA] . . . establishes a nonwaivable right to initial judicial enforcement,” the Court states, “one must also believe that it establishes a nonwaivable right to initial judicial enforcement in any competent judicial tribunal.” Ante, at 102. In Sportin’ Life’s words, “it ain’t necessarily so.” While there is good reason to believe Congress cared about the institutional location of consumers’ suits under the CROA, there is no reason to think Congress sought to disturb the personal jurisdiction and venue rules that determine in which court a civil action may be brought.

 See Brief for American Association for Justice as Amicus Curiae 12, and n. 6 (listing arbitration decisions since the CROA’s enactment).